Willie Lee MAYES, Appellant,

v.

The STATE of Texas, Appellee.

No. 504–88.

Court of Criminal Appeals of Texas,
En Banc.

May 29, 1991.

Rehearing Denied Oct. 2, 1991.

Dick Swift, Palestine, for appellant.

David P. Weeks, Chief Sp. Prosecutor
and Travis L. McDonald, Jr., Asst. Sp.
Prosecutor, Huntsville, and Robert Hut-
tash, State's Atty., Austin, for the State.

OPINION ON STATE'S PETITION FOR
DISCRETIONARY REVIEW

WHITE, Judge.

Appellant was convicted of aggravated kidnapping and sentenced to ninety-nine years confinement in the Texas Department of Corrections. On appeal to the Twelfth Court of Appeals, appellant complained that the trial court's admission of evidence that appellant was incarcerated in "administrative segregation" of the Beto I Unit of the Texas Department of Corrections was erroneous because such evidence constituted evidence of bad conduct, in contravention of Rule 404 of the Texas Rules of Evidence. The Court of Appeals agreed and reversed appellant's conviction, concluding that the evidence was not introduced merely to show where the offense occurred, but to imply that appellant was a violent person. See *Mayes v. State* (Tex. App.—Tyler, No. 12–86–239–CR, delivered November 10, 1987). We granted petition for discretionary review to determine if the Court of Appeals erred in ruling that the trial court acted improperly in admitting into evidence the respondent's confinement in the administrative segregation wing of Beto I. Tex.R.App.Pro., Rule 200(c)(2).

I.

Around midnight on February 28, 1985, James Bitenc and James Johnson, both Texas Department of Corrections officers, were returning Reginald Reed to the cell which he shared with appellant. As Officer Johnson held the flashlight, Officer Bitenc unhandcuffed Reed, who thereupon spun around, grabbed Bitenc's shirt and began dragging him into the cell. Appellant was in the bunk bed while Reed and Bitenc struggled. Appellant began to rise out of the bed, but was ordered back by Bitenc. Appellant rose again from the bed and Bitenc hit him repeatedly with an aluminum riot baton, an act for which the officer was later reprimanded. Appellant then rose from the bed with a "shank," a piece of metal inmates sharpen into knives. Reed had pushed Bitenc in the corner of the cell and held him at bay with a shank of his own. Appellant grabbed Bitenc by his collar.

According to Bitenc, he asked appellant at this point, "What the hell did I ever do to you?", to which appellant responded, "You son of a bitch, you hit me in the mouth." Officer Johnson entered the cell in an attempt to subdue appellant, who was holding Bitenc by the collar. Johnson was attempting to subdue Reed when two other officers arrived and entered the cell. These other officers attempted to persuade Reed and appellant to drop their shanks.

Instead, Reed attempted to handcuff Bitenc in an unworkable fashion, finally succeeding in handcuffing Bitenc's hands behind his back. Then both Reed and appellant escorted Bitenc outside of the cell. Johnson and another officer were ordered off the wing, while the remaining officer, Sergeant Woody, offered to exchange himself for Bitenc. Presumably in a show of good faith, Sergeant Woody removed a handcuff still dangling from Reed's arm, but Reed handcuffed him as well. Then Reed and appellant escorted both Bitenc and Woody to a landing on an upper row.

Once on the upper row, appellant declared himself "in control" and began making demands to the warden and other personnel who had arrived. By this time appellant was armed with a shank in each hand, both measuring approximately ten inches in length. Separated from the prison personnel by a grill of steel bars, appellant demanded the release of certain "road dogs," i.e., inmates considered as friends. When this demand was not met, appellant became angrier, shouting obscenities and threatening to kill the officers. He further demanded, among other things, a radio for Reed, better food, and a steak. According to the warden, appellant also complained that he was "sick of prison, that he had no intentions of serving his sentence, that he was leaving." Appellant also told the warden that, "You-all ain't running things right down here. You're letting homosexual inmates run things around this place. And I've had enough and I'm going to do something about it."

Although the warden attempted to calm appellant, appellant expressed distrust toward the personnel, saying that they were trying to 'game' him by assuring him that they would consider his demands. At some point, the warden ordered that a videotape be made to record the event on film. Both appellant and Reed became increasingly tense, disagreeing between themselves about their course of action, but continuing to threaten the officers' lives if their demands were not met.

Sometime during this forty-five minute affray, Reed and appellant became convinced that their demands and actions were not being taken seriously. According to Bitenc, Reed went "crazy. He would come up . . . and hit me with a riot baton on the left side or the right side of my body and Mayes would pull me and say, 'I'm going to cut this son of a bitch and throw him down the stairs.'" (Officer Johnson described Reed's behavior differently, saying that Reed "would take that baton and tap on him [Bitenc] a little bit.") They grabbed Bitenc and shoved him down the stairs to the lower level, but Bitenc did not fall. According to Bitenc, appellant looked down at him and said, "you ain't hurt," then came down the stairs and began pulling him back up to the upper level.

At this point, the warden ordered the door on the lower level to be opened, whereupon about fifty of the one hundred officers who had amassed at the doors flooded the area, armed with various weapons, including a .357 Magnum, a shotgun and an automatic rifle. Appellant and Reed were quickly overcome.

The entire incident occurred in the administrative segregation wing of Beto I unit at the Department of Corrections. This wing was reserved for inmates whose separation from the larger prison population is deemed necessary either because the segregated inmates themselves require protection from inmates in the larger population or because they have a record for engaging in violence. Appellant had been transferred to the administrative segregation wing because he had been stabbed by "Hispanics" in another unit. Although

segregated, appellant came to believe that another "hit" on him was imminent.

At a pretrial hearing, appellant made a motion in limine in which he anticipated that the State would attempt

"to prove what the Administrative Segregation Unit is in an effort to prejudice and bias the jury. This Defendant would show that Administrative Segregation is, according to the State, for prisoners who cannot be handled in other places, i.e. troublemakers. Defendant disputes this, but would show that any testimony regarding Administrative Segregation can only prejudice this Defendant and deny him a right to a fair trial. It has absolutely nothing to do with the facts of this case and should not be admissible in any way at the guilt or innocence stage."

The State urged that the fact that appellant was in administrative segregation "was an operative fact of the offense committed. Goes to the location, goes to how those prisoners are handled, how they're brought in and out of their cells and that sort of thing. I think the jury is entitled to know what administrative segregation is."

Appellant replied that "that evidence unfairly prejudices the jury against my client saying this is where we put the bad guys, the ones that misbehave. I think that's basically a statement of prior acts and prior misconduct. It's not admissible. If he want's to talk about them being on Wing 1 or Wing 3 and how they handle them, that can be done without talking about that. I think it's clearly prejudicial."

The trial judge decided that "I think the State is entitled to show what the conditions are inside the penitentiary and that may accrue to your client's best interest as to what administrative segregation is and I'm going to overrule the motion regarding administrative segregation." Appellant's trial then commenced.

Bitenc was the first of the State's witnesses. The prosecutor asked him to define administrative segregation. Appellant objected, saying, "I object to that as being an attempt to prejudice the jury by prior acts of misconduct on behalf of Mr. Mayes." The trial judge overruled the ob-

jection and Bitenc told the jury, "[a]dministrative segregation is where you house the inmates that are a threat to the general population of the prison, a threat to staff, threat to the other inmates and just generally cannot get along."

On cross-examination, appellant asked Bitenc:

"Q. Okay. And let's talk about administrative segregation for a minute. That's a special area of the prison, right?

"A. Yes, sir.

"Q. And I believe you told us that you keep people there that are basically a threat to everyone, right?

"A. Yes, sir.

"Q. You also house people there sometimes for their own protection, don't you?

"A. Yes, sir.

"Q. People also get put in administrative segregation for failing to follow rules, don't they?

"A. Yes, sir.

"Q. So they're not necessarily violent if they're put into administrative segregation, are they?

"A. No, sir, administrative segregation is broke [sic] down to Class A, Class B security."

On redirect, the prosecutor returned to the subject to administrative segregation:

"Q. Are inmates in administrative segregation treated differently than inmates in the general population?

"A. No, sir.

"Q. In regards to security precautions are they treated differently?

"A. In security precautions, yes.

"Q. Why is that?

"A. Because they're—

[Defense Counsel]" Your Honor, I object. Make my same objection. He's introducing evidence of other acts. I know the Court's ruled. I want my record on it.

[Prosecutor]: Your Honor, he raised a question as to why he hit Inmate Mayes. I'm going into the officer's state of mind and those factors he considered in dealing with the situation when he was in that cell.

THE COURT: Overruled. You may answer the question.

THE WITNESS: Restate the question.

"Q. All right. Did you take the fact that these were administrative segregation inmates into account in the way you dealt with the situation with Mayes coming up off that bunk?

"A. Yes, I did.

"Q. Was that because of the type of inmate and the fact that they were in administrative segregation?

"A. Yes."

The next day the State called its second witness, Officer Johnson. Appellant quizzed Johnson at length about various procedures employed on the wing, but avoided the question of the nature of administrative segregation. On redirect, however, the prosecutor went into the subject:

"Q. [Appellant's counsel] asked you on cross about ad seg. What does ad seg stand for?

"A. Well, administrative segregation. That's part of TDC for inmates that do not for various reasons make it in population. They get in trouble or they need to be protected from other inmates that want to kill them or they get a lot of disciplinary cases. They get in fights, either striking other inmates or officers or whatever and they'll separate them from the rest of the population in a special area.

"Q. Due to behavior—

"A. Due to behavior, due to documented behavior on their part. It's not intended to be punishment. It's just since they've got to be kept somewhere they're kept separated from the other prisoners because when they were out there with the other prisoners they got in trouble fighting or beating them up or whatever."

The prosecution next called Warden Collins and after establishing his credentials, asked him whether he had ever seen appellant before the incident. He replied, "Yes, sir, I've had dealings with Inmate Mayes

being one of our more volitile [sic] inmates I had occasion to talk to." Appellant objected to the testimony "as being statements about other acts contained in the motion in limine. I object to it. It's not admissible." The court sustained the objection and admonished the jury to disregard, but overruled appellant's motion for mistrial. Later the prosecution asked, "As a matter of fact had Inmate Mayes come from another farm?" The warden answered, "He [had] been transferred. On that particular sentence he had been transferred twice and had come to Beto as a result of disciplinary action." Appellant objected, saying, "Again, it's the same thing as we talked about. It's inflammatory and prejudicial. It's not relevant to this case." The objection was sustained, appellant's motion to strike was granted, but his motion for mistrial "based on both of these comments" was overruled.

Captain Smith was the next prosecution witness. On cross, appellant attempted to introduce evidence about "Fly," an associate of appellant, who had been placed in protective custody after being stabbed by a gang, and who had attempted to alert appellant that an attack on him was imminent. Appellant's counsel believed that Fly's attempts to communicate when the "hit" was to take place was known by the officers.

"Q. Why was the Hispanic [Fly] in protective custody?

[Prosecutor]: Objection, Your Honor. Counsel has repeatedly asked we not go into reasons behind someone being in protective custody or in administrative segregation.

THE COURT: Sustained."

Appellant finished his cross-examination by saying, "I pass the witness but I would like to make a bill on that objection that was sustained."

Outside the presence of the jury, appellant asked Smith "what reasons people are put in protective custody, please, sir?" Smith answered:

"Fear of their life, if there's a gang hit on them that we can confirm. If they're a confirmed gang member and denounce their gang, we have hard evidence to show they've denounced their gang, we put them there. If they refuse to do a hit for a gang we put them in protective custody. If they witness an event and testify against some individuals and we feel repercussions may come, we put them in protective custody. If they are abnormally small—some come in weighing less than a hundred pounds, only four foot tall, it would be very hard for them to make it in some of the population wings. We grant that type of protective custody. The general phrase is threatened from harm of others, if anything falls within that phrase."

However, because Smith did not know anything about the transfer of "Fly" into protective custody, Smith did not testify before the jury on this point.[1]

Before introducing evidence, defense counsel explained to the judge that the attack on "Fly" had occurred about a week before the incident and that appellant, believing that he was next, desperately wanted another transfer, which is another method which TDC uses to protect targeted inmates. In his opening remarks, defense counsel told the jury that he intended to show them that appellant "was in ad-seq, you heard. And he had been moved to Beto I as a result of his being attacked and stabbed." He called Inmate McGowan who remembered appellant "talking about he got stuck on Coffield by some Mexicans, Hispanic inmates."[2] Over the State's ob-

---

1. Because Smith did not know the name of the Hispanic who was placed in protective custody, counsel concluded that he was incompetent to testify about "Fly", remarking that "it's [evidence regarding the protective custody of "Fly"] kind of moot."

2. On cross-examination, the State pursued the question:

"Q. When did Mayes tell you about this incident where he was supposeably [sic] stabbed?
A. Supposeably [sic] stabbed?
Q. Yeah.
A. He told me about it when I was assigned next door to him.
Q. When did he say this supposeably [sic] happened?

jections, appellant sought to introduce the hospital records compiled on appellant's stab wounds which he received on the Coffield Unit.

The Court decided that appellant could offer the records "for the limited purpose of showing the state of mind of the defendant on this occasion but if the State wishes to offer other portions of his record, they may." Appellant chose not to introduce the records of his stabbing at Coffield.

The Twelfth Court of Appeals reviewed the questions which the prosecution posed to Officer Bitenc about the nature of administrative segregation and concluded that the questions were objectionable and the testimony inadmissible. *Mayes v. State, supra,* slip op. at 9. The appellate court reasoned that while "no error was committed by informing the jury as to where the offense occurred," Officer Bitenc's "testimony went further than that. His testimony characterizes Mayes as a person with a propensity for violence and assaultive behavior."

On rehearing, the State argued that "if the testimony of Bitenc was erroneously admitted, the error became harmless when Officer Johnson's testimony was subsequently received without objection." The Court of Appeals disagreed, stating, "Although Officers Johnson and Bitenc both testified about the character of "administrative segregation," their testimony on the factual reasons for segregation was quite different." *Mayes v. State* (Tex.App.—Tyler, No. 12–86–239, delivered December 31, 1987) (opinion on rehearing). The Court of Appeals reversed appellant's conviction and remanded the cause for a new trial.

## II.

Trial in this cause began on September 29, 1986. Thus, the new Rules of Criminal Evidence were in effect.

> A. On Coffield.
> Q. Do you know when that occurred, what time period, what year?
> A. No, sir.
> Q. Did Willie Mayes come over to Beto directly from the Coffield Unit?

Before an item of evidence may be admitted, it must first be deemed "relevant." The Rules of Criminal Evidence define relevant evidence broadly as proof "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Crim.Evid., Rule 401. In its brief, the State argues that it is "entitled to prove not only how the offense happened but also where it happened." Thus the first question to be answered is whether evidence of the location of the instant offense is "relevant" under the codified rules of evidence.

In order to be included in the expansive definition of "relevant evidence," proffered evidence must have influence over a consequential fact, i.e., "any fact that is of consequence to the determination of the action." Under pre-Code evidentiary law, a consequential fact was one disputed at trial. See *Johnson v. State,* 698 S.W.2d 154, 160 (Tex.Cr.App.1985), cert. denied, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986) ("to be admissible, evidence must be relevant to a contested issue."). See also *Stone v. State,* 574 S.W.2d 85, 89 (Tex.Cr. App.1978). Rule 401, however, makes no demand that facts or issues be contested before judicially regarded as "relevant." The Texas rule was crafted from the federal Code which specifically excluded any requirement that facts be disputed in order to be relevant. See Goode, Wellborn & Sharlot, Tex.Practice, Sec. 401.3 (1988). See also 56 F.R.D. 183, 216 (1972) ("fact to which the evidence is directed need not be in dispute.").

Having discarded the dispute requirement, Rule 401 deems "relevant" any evidence which influences consequential facts, i.e., facts which have something to do with the ultimate determination of guilt or innocence in a particular case. In the present

> A. I think he come off Darrington.
> Q. Off of Darrington. Do you know why Inmate Mayes was transferred to Beto I?
> A. No, sir."

case, the State fails to show how or why evidence that administrative segregation in a prison facility reserved for particular classes of inmates has anything to do with appellant's guilt. The State merely mentions "location and access" as facts presumably so self-evidently "of consequence" as to render an explanation unnecessary. Because the nature of administrative segregation has not been shown to be a consequential fact, evidence introduced to support it is not relevant under a strict reading of Rule 401.

■ However, the State makes a more tenable case by insisting that this evidence is relevant because it creates a context from which the factfinder may more ably make judgments about facts of a particular case. To preclude evidence of the location of an offense, the State argues, would "leave the State trying cases in a vacuum. It would leave juries in the dark as to certain circumstances about the offense."

There is authority which suggests that evidence of the facts and circumstances of an offense are relevant. See, e.g., *Burns v. State*, 556 S.W.2d 270, 282 (Tex.Cr.App. 1977), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). The advisory notes to the federal rule indicate, somewhat obliquely, that background evidence is relevant simply because it acts as "an aid to understanding." Advisory Committee's Note to Federal Rule 401. ("Evidence which is essentially background in nature ... is universally offered and admitted as an aid to understanding ... [M]any items of evidence fall into this category. A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission."). It therefore appears that background evidence was meant to be included within the definition of relevancy, not necessarily because it influences a con-

sequential fact, but because it illuminates a circumstance otherwise dimly perceived by the factfinder.

The State contends that in the present case the evidence of where the offense occurred is helpful to the jury's comprehension of the offense itself. Like the appellate court, we agree and hold that such background evidence is relevant. Appellant, too, joins the State in this conclusion. Indeed, appellant never lodged an objection against evidence of location, and everyone is in agreement that the offense occurred at one end of the administration segregation ("S") wing of the Beto I Unit, in Anderson County, Texas, "just outside of Palestine." In fact, it was appellant who introduced the approximately forty-five minute videotape of the event as a further refinement of the jury's comprehension of the offense. Thus, everyone associated with the case is in harmony that evidence of the location of an offense is relevant. The conflict arises in discerning whether this background evidence, even though it is relevant as helpful to the jury, should be admitted as an "exception" under Rule 404(b).

### III.

The State seems to contend that background evidence is one of the "other purposes" under which character evidence may be admitted under Rule 404(b).[3] The cases which the State cites in its brief all involve the admission of extraneous bad acts: *Taylor v. State*, 420 S.W.2d 601 (1967) (in trial for murdering married couple in a truck, evidence that defendant killed husband in trial for wife's murder held admissible as one continuous transaction); *Williams v. State*, 535 S.W.2d 637 (Tex.Cr.App.1976) (evidence of defendant's possession of various incriminating items at time of arrest held admissible in punishment phase); *Dunlap v. State*, 462 S.W.2d 591 (Tex.Cr.

---

**3.** Rule 404(b) reads:

"Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction."

App.1971) (evidence that defendant killed his wife's twin sister held admissible in trial where defendant was accused of "assault with intent to murder" his wife); *McCann v. State*, 606 S.W.2d 897 (Tex.Cr. App.1980) (evidence of the capital murder of burglary victim held inadmissible in trial of conspiracy to commit burglary of a habitation); *Thompson v. State*, 652 S.W.2d 770 (Tex.Cr.App.1981) (in aggravated robbery trial, evidence that the defendant took a witness's car at gunpoint in an attempt to elude the police held admissible).

The State's contention appears to conflict with Rule 404's proscription of admission of character evidence. Evidence of a defendant's bad character traits possesses such a devastating impact on a jury's rational disposition towards other evidence, and is such poor evidence of guilt, that an independent mandatory rule was created expressly for its exclusion. See Rule 404. See also Imwinkelreid, Uncharged Prior Misconduct, Sec. 1.02 (1984) ("Evidence of uncharged misconduct strips the defendant of the presumption of innocence.") This propensity rule, as it is sometimes called, states that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith," and is emphasized twice in Rule 404. It is a rule which ensures that a person is tried for the offense he has allegedly committed, and not for the type of person that he is.

The propensity rule is mandatory; when the rule of exclusion codified in Rule 404 applies, only those purposes other than propensity, such as those listed in subsection (b) of Rule 404, will justify otherwise inadmissible character evidence. Such evidence must be directed at a consequential fact, and its probative value must not be outweighed by its prejudicial potential. See *Morgan v. State*, 692 S.W.2d 877, 879 and 882 (Tex.Cr.App.1985). For other cases which also involve admission of extraneous acts, see *Webb v. State*, 760 S.W.2d 263, n.

18, at 275–276 (Tex.Cr.App.1988); *Murphy v. State*, 777 S.W.2d 44, at 62 (Tex.Cr.App. 1988); and *Couret v. State*, 792 S.W.2d 106, at 107 (Tex.Cr.App.1990).

In the past, background evidence was admitted "[t]o show the context in which the criminal act occurred ... under the reasoning that events do not occur in a vacuum and that the jury has a right to hear what occurred immediately prior to and subsequent to the commission of the act so that they may realistically evaluate the evidence." *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex.Cr.App.1972). The drafters of the Rules of Criminal Evidence apparently did not intend to depart from Texas caselaw, even when setting down Rule 404(b). Therefore, while not specifically enumerated within Rule 404(b)'s list of admissible exemplary "other purposes," background evidence was meant to be included as one of the alternative rationales for which character evidence may be admitted. The facts of the instant case call for an assessment of that proposition.

Background evidence, once called "res gestae" of the offense, has also come to refer to other offenses indivisibly connected with the offense charged, and not only general background evidence which is helpful to the jury's understanding. See 23 Tex.Jur.2d, Evidence Sec. 196 (1972). The term "res gestae" itself seems to have been the source of the confusion. See 2 Wigmore, Evidence, Sec. 365 (Chadbourn rev. 1979) (phrase " 'res gestae' ... merely serves to obscure thought and confuse principle."). Furthermore, the absence of jurisprudence on the infrequently litigated subject of background evidence has also created an analytical void, confusing the distinction between other offenses connected with a primary offense, and general background evidence. To distinguish in the instant case between these two different types of contextual evidence, we will refer to the former as "same transaction" contextual · evidence [4] and the latter as

---

**4.** Same transaction contextual evidence is deemed admissible as a so-called exception to the propensity rule where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the oth-

"background" contextual evidence. Because the evidence in the present case was not offered as necessary "same transaction" evidence, but contextual "background" evidence, it will be treated so here.

Contextual "background" evidence has been admitted not out of necessity but out of judicial grace. "[C]onsiderable leeway is allowed even on direct examination for proof of facts that do not bear directly on the purely legal issues, but merely fill in the background of the narrative and give it interest, color, and lifelikeness. Maps, diagrams and charts, for example, are material as aids to the understanding of other material evidence." McCormick, Evidence Sec. 185 (3rd ed. 1984). It has also been pointed out that background evidence often comes in only because no one objects to it. See 22 Wright & Graham, Federal Practice and Procedure, Sec. 5164 at 45–46 (1978). In short, contextual "background" evidence has been admitted frequently in trials solely because of the salutary effects it has on the jury's comprehension of the offense in question. It becomes a question before this Court whether this relatively ignored category of evidence, when it is admitted by the grace of the trial court, and used by the proponent to describe a defendant's character, should nevertheless become one of the unenumerated purposes under which character evidence may be admitted under Rule 404(b).

The seminal *Albrecht* opinion mentions that the realistic evaluation of the evidence was the underlying reason for the admission of what was once called "res gestae." *Albrecht* at 100. However, not one of the decisions which the *Albrecht* opinion footnoted treats contextual "background" evidence as another purpose for which character evidence may be used. See *Albrecht, supra,* at 100, n. 1. See also 23 Tex.Jur.2d,

Evidence Sec. 196. Those cases, and many others, address only the admissibility of contextual "same transaction" evidence, not the "background" evidence at issue here. The absence of analysis of "background" evidence has likewise been noted by the federal courts. See Government of *Virgin Islands v. Grant,* 775 F.2d 508, 513 (3rd Cir.1985) (jurisprudence of "background evidence" is essentially undeveloped, not mentioned in the rules of evidence, and has received no attention in treatises). A perusal of the federal opinions which do treat "background" evidence reveals a reluctance to admit character evidence on contextual grounds. See, e.g., *United States v. Park,* 525 F.2d 1279, 1284, n. 7 (5th Cir.1976) (government's evidence of other crimes to "place the witnesses in their environment" rejected); *United States v. Prescott,* 581 F.2d 1343, 1352 (9th Cir.1978) ("Inadmissible evidence, which can readily be misinterpreted by the jury, should not be admitted just to put the relevant facts in their true setting."); *United States v. Lamberty,* 778 F.2d 59, 61 (1st Cir.1985) (background evidence offered to satisfy the jury's curiosity should have been excluded). But see *United States v. Vitale,* 596 F.2d 688, 689 (5th Cir.), cert. denied, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979) (background evidence admissible to show the reasonableness of the officer's actions).

■ The federal judicial reluctance to admit character evidence under the guise of "background" evidence may have come from the need to avoid an inadvertent subversion of the general rule of inadmissibility. To justify admission of character evidence on the rationale that it is "helpful" as "background" would break new ground, fertile for evidentiary exploitation, and rich in its potential for unsettling the law of

---

ers." *Nichols v. State,* 97 Tex.Crim. 174, 260 S.W. 1050 (1924) (citing Underhill on Criminal Evidence, Sec. 152). The reason for its admission "is simply because in narrating the one it is impracticable to avoid describing the other, and not because the other has any evidential purpose." Wigmore, supra. See also 4 Branch's Anno.P.C. (2d ed. 1956), sec. 2255, p. 618, quoted in *Taylor v. State, supra,* cited by the State ("It is well settled that '[w]here the offense is

one continuous transaction, or another offense is a part of the case on trial or blended or closely interwoven therewith, proof of all the facts is proper.' "). Necessity, then, seems to be one of the reasons behind admitting evidence of the accused's acts, words and conduct at the time of the commission of the offense. See *Solosky v. State,* 90 Tex.Crim. 537, 236 S.W. 742 (1922) ("necessary" for the State to prove extraneous offense).

character evidence. To hold that "background" alone is another "purpose" under Rule 404(b) would transform a previously unobjectionable class of marginally relevant evidence into a perennially contested issue. We therefore hold that character evidence offered on the rationale that it is "background" evidence helpful to a jury, but apparently in conflict with the proscription of Rule 404(b), is not admissible as one of the alternative purposes such evidence may be introduced under Rule 404(b).

Bitenc's testimony may well have been mere "background" about the location of the offense, but is also possessed a character component. The logical understanding Bitenc's testimony conveys is that appellant, because he was housed in administrative segregation, was "a threat to the general population of the prison, a threat to staff, threat to other inmates, and generally cannot get along." Because the testimony constituted evidence of appellant's character, it was error to admit it. It is true appellant was allowed to show through Bitenc's cross-examination that administrative segregation served other functions besides isolating inmates who caused violence; instigators of prison violence as well as victims are housed there. The jury was left to speculate, however, into which of these categories of administrative segregation appellant may have fallen. Thus, the prejudicial impact of Bitenc's direct testimony was not wholly neutralized, and we cannot conclude error in admitting it was "cured" by appellant's cross-examination of Bitenc. However, this does not conclude our inquiry into the reversibility of this error.

■ The State argued in its brief to this Court, as it argued to the Court below, that admission of Bitenc's direct testimony did not harm appellant because of the admission of Johnson's direct testimony without objection by appellant. We agree with the State. Tex.R.App.P. Rule 81(b)(2).

Before we begin our examination of the relevant factors in this case, we are constrained to observe that once error has been found, there is a presumption of error arising from the language of Rule 81(b)(2) itself. The reviewing court is then called upon to make its own analysis to determine whether it can consider the error to have been harmless "beyond a reasonable doubt." Tex.R.App.P. 81(b)(2). The State has no "burden of proof" or "burden of persuasion" in the sense that it would if it bore the responsibility to come forth with arguments establishing the harmlessness of an error in order to prevail, but it will indeed suffer reversal on appeal if the reviewing court cannot determine after its examination of the record that an error was harmless beyond a reasonable doubt.

After examining the record, we conclude that the admission of Johnson's testimony without objection rendered the admission of Bitenc's testimony harmless because it established substantially the same evidence of appellant's character as did the admission of Bitenc's testimony.

In *Anderson v. State,* 717 S.W.2d 622 (Tex.Cr.App.1986), cert. denied, —— U.S. ——, 110 S.Ct. 3232, 110 L.Ed.2d 678, this Court stated that "inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove." *Anderson v. State,* at 628, and cases cited therein; *Gardner v. State,* 730 S.W.2d 675, at 697 (Tex.Cr.App.1987); *Brown v. State,* 757 S.W.2d 739, and footnote at 741 (Tex.Cr. App.1988); and *Willis v. State,* 785 S.W.2d 378, at 383 (Tex.Cr.App.1989). We find beyond a reasonable doubt, in the instant case, that the erroneous admission of Bitenc's testimony over appellant's objection did not contribute to the jury's verdict at either stage of appellant's trial because of the admission of Johnson's testimony without objection from appellant.

As pointed out earlier in this opinion, the Court of Appeals' held that Bitenc and Johnson's testimony "on the factual reasons for segregation of inmates was quite different." *Mayes v. State,* slip op. at 1 (Tex.App.—Tyler, No. 12–86–239, delivered December 31, 1987) (opinion on rehearing). We find the Court's conclusion to be unsupported by the record of the guard's testi-

mony. As pointed out earlier in the body of this opinion, both guards testified that inmates are placed in administrative segregation because of their bad behavior, or to protect them, or to protect the rest of the prison population from them. Their testimony was not quite different. The distinction between the testimony of the two guards was that appellant objected to Bitenc's testimony, but failed to object to Johnson's testimony.

The judgment of the Court of Appeals is reversed and the judgment of the trial court is affirmed.

CAMPBELL, MALONEY and BENAVIDES, JJ., concur in the result.

CLINTON, J., disagrees that the error was harmless.

BAIRD, J., not participating.