MARY'S OPINION HEADING 



 NO. 12-02-00180-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


NATHANIEL ARTHUR DOSS,
§
 APPEAL FROM THE 

APPELLANT


V.
§
 CRIMINAL DISTRICT COURT 2


THE STATE OF TEXAS,

APPELLEE
§
 TARRANT COUNTY, TEXAS

 

MEMORANDUM OPINION


 A jury found Appellant guilty of capital murder by committing murder during the commission
of aggravated sexual assault. The trial judge, as required by statute, assessed Appellant's punishment
at imprisonment for life. In his first issue, Appellant contends the trial court erred in admitting
evidence of his extraneous bad conduct despite the State's failure to give proper notice. In
Appellant's second issue, he contends the trial court erred in allowing a police officer to express his
opinion to the jury that Appellant was guilty of sexual assault. We affirm.


Background


 At about 3:30 p.m., October 1, 1999, Summer Little was found dead on the second floor
bathroom of her apartment, nude, with her head and upper body face down in the bathtub, and her
legs hanging over the side of the tub. The first paramedic on the scene determined that Little's death
did not appear to be an accidental drowning, and called the police.

 The police found no sign of forced entry into the apartment. They found blood on the floor
of the downstairs bathroom. They collected the shorts and bra lying on the living room floor, a
bloodstained tee-shirt on the sofa, and a bloodstained Kleenex on top of the television. Upstairs, they
found a pair of panties on the floor by the bed. They collected blood samples from the toilet rim and
the corner of the bathtub in the upstairs bath. Analysis of the blood from the first floor bathroom
indicated that it was Summer Little's blood.

 Investigators found a fingerprint in the downstairs bathroom sink, and three palm prints from
the wall above the upstairs bath. All these prints were later identified as Appellant's.

 An autopsy revealed that Summer Little had several blunt force injuries to the head. These
injuries included a laceration of the upper lip, a bruise and swelling above her right eye, a bruise
above her left ear, and deep bruises under the scalp on both sides of her head. Internal examination
discovered hemorrhages to the muscles of the neck. The examiner also noted a blood-tinged froth
around her mouth and nostrils indicating that she was still breathing while her face was in the water. 
The examiner determined that death was caused by strangulation with a soft ligature and drowning. 
Little's body had hairs, carpet fibers, and "patterned petechial contusions" on her posterior left
shoulder, facts indicating that she had been dragged across the carpet. He found no signs that
Summer Little struggled with her attacker.

 The medical examiner also conducted a sexual assault examination discovering a small
abrasion of the anus. No semen was detected. The examiner could not give a time of death, but
concluded that Little had been dead for at least six to eight hours before the 7:40 p.m. examination
on October 1. Little had talked to a friend on the telephone at 9:00 p.m. on September 30.

 While checking the whereabouts of Little's boyfriend, the police interviewed Appellant who
was unable to produce any identification. Acting on a tip, the police searched Little's apartment and
found Appellant's wallet containing his social security card under the sofa in Little's living room.

 At trial, Selena Jones, Appellant's girlfriend, testified that Appellant "had issues" with
Summer Little because he believed she was telling lies about him to his friends and because she owed
him fifty dollars. He told Selena that he wanted Little dead. When Appellant heard that Little had
thrown her boyfriend out of her apartment, he told Selena that Little was now "open game."

 Selena testified that she, Chris Brockman, and Appellant went to a party the night before
Little was murdered. When they left the party between six and seven o'clock a.m., Appellant
dropped Brockman and Selena off, saying he had a problem he needed to take care of. He returned
in about an hour and told Selena that Little was dead. Appellant also told Selena that he could not
find his wallet, and he was afraid he had left it at Little's apartment. Appellant had blood on his rings
and asked Selena to wash them. He also asked her to get a bag from his vehicle. Looking inside the
bag, she found Summer Little's wallet, with her food stamp card, identification, children's photos,
and a heart-shaped pendant.

 Two days later, Appellant told Selena that shortly before the murder he had had sex with
Little which had "started out" to be consensual. He said that he had hit her in the face. Several other
witnesses confirmed that Appellant was angry over the fifty-dollar debt and that he had several times
threatened to kill Little.

 Michael Tealer lived at the same apartment with Appellant and Selena. He testified that the
night before Little's murder, Appellant, Brockman, and Selena left for a party. When he awoke the
next morning at around seven to eight o'clock a.m., only Brockman and Selena were there. Appellant
showed up at around nine to ten o'clock a.m. Tealer testified that he heard Appellant ask Selena
where his wallet was. Two other residents of the apartment, Anna Acevedo and Elias Perez, testified
that Appellant, Brockman, and Selena left for the party together, and that Appellant returned later
than the other two. Both Acevedo and Perez heard Appellant ask Selena about his wallet. Acevedo
heard him ask Selena to wash his rings.

 Perez testified that late in the night before Little was killed, Appellant asked to borrow his .38
derringer because he needed it for something he had planned. Perez loaned him the gun, and
Appellant returned it the next morning.

 Earl Fields testified that while he and Appellant were in the Tarrant County Jail, Appellant
devised a scheme whereby he would write a letter to his mother claiming that he was being framed,
but also claiming to know who Summer Little's real killer was. Appellant planned to throw the letter
away, and Fields was to retrieve it from the trash and hand it over to the detectives. Appellant also
told Fields that blood ran from Little's nose "like a river" all over the bathroom, upstairs, and
downstairs.


Evidence of Extraneous Bad Conduct


 In his first issue, Appellant complains that the trial court erred in admitting evidence that he
borrowed Perez's pistol the night before Little's murder and was therefore in possession of a deadly
weapon. 

 Upon Appellant's request, the State filed notice of its intent to use evidence of Appellant's
extraneous offenses. The list of extraneous offenses provided with the notice did not include any
information regarding Appellant's possession of a deadly weapon. There is no allegation that
Appellant used a firearm during the commission of the offense nor is there any direct evidence that
a firearm was used in its commission. Therefore, Appellant argues this was evidence of an
extraneous bad act, admitted without proper notice required of the State by Rule 404(b) of the Texas
Rules of Evidence.

 The State argues that Appellant borrowed Perez's pistol shortly before the murder and
returned it shortly thereafter. There was no evidence of forced entry into Little's apartment and the
medical examiner found no defensive wounds on her body. The State theorized that the pistol could
have been used to gain entry into Little's apartment and to compel her to have sexual relations with
him. The State contends that because the crime or misconduct arose in the same transaction, the
conduct in question was not extraneous but same transaction contextual evidence, part and parcel of
the offense for which Appellant was tried. Therefore, the State insists, no notice of the misconduct
was required under 404(b), and the trial court did not err in admitting evidence of it.

 If, as the State contends, the evidence of other bad acts is same transaction contextual
evidence, Rule 404(b) does not require the State to give notice to the accused of its intent to introduce
evidence of those bad acts in its case-in-chief. Hodge v. State, 940 S.W.2d 316, 319 (Tex.
App.-Eastland 1997, pet. ref'd).

Applicable Law

 Rule 404(b) states, as follows:


 Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove
the character of a person in order to show conformity therewith. It may, however, be admissible for
other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or
absence of mistake or accident, provided that upon timely request by the accused in a criminal case,
reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such
evidence other than that arising in the same transaction.



Tex. R. Evid. 404(b) (emphasis added). Rule 404(b) by definition excludes from the notice
requirement crimes arising in the "same transaction." Therefore, same transaction contextual
evidence is not subject to the requirement in Rule 404(b) that the State must give the accused notice
of the State's intent to introduce such evidence. Hodge, 940 S.W.2d at 319. 

 In Mayes v. State, 816 S.W.2d 79 (Tex. Crim. App. 1991), the court of criminal appeals
recognized that the term "res gestae" for background evidence refers to other offenses inextricably
connected with proof of the charged offense as well as to other offenses that were merely part of the
background of the primary offense and helpful to the jury's understanding. Mayes, 816 S.W.2d at
86. Another offense, wrong, or bad act is considered same transaction contextual evidence where the
crimes are "intermixed, or blended with one another, or connected so that they form an indivisible
criminal transaction, and full proof . . . of any one of them cannot be given without showing the
others." Id. at 86 n.4 (citations omitted). The other type of background evidence the court called
"background" contextual evidence, which it defined as facts not bearing directly on the purely legal
issues, but facts that merely fill in the background of the narrative and give it interest, color and
lifelikeness. Id. at 87. In Ramirez v. State, 815 S.W.2d 636 (Tex. Crim. App. 1991), issued three
weeks after Mayes, the defendant was charged with capital murder committed in the course of the
burglary of a habitation. The victim's daughter testified that just before her mother died in her arms,
her mother mumbled, "They raped me." The appellant in his confession stated that he and Hernandez
had entered to steal the television. The court held that the evidence of sexual assault bore on the
material issue of Ramirez's burglarious intent and was admissible. "[T]he sexual assault was a part
of the criminal transaction and not an extraneous event." Id. at 642. "Circumstances of the offense
which tend to prove the allegations in the indictment are not extraneous offenses." Id. at 643.

 In Camacho v. State, 864 S.W.2d 524 (Tex. Crim. App. 1993), the indictment alleged that
Camacho committed murder while in the course of burglarizing Sam Wright's home. After entering
the house with several armed men demanding repayment of an alleged $20,000 drug debt, Camacho
shot the victim, David Wilburn, when he came to the Wright residence. Wright escaped from the
house. Camacho fled taking Wright's son and spouse with him to Oklahoma. Several days later,
members of the appellant's group killed both the son and the spouse. Although there was strong,
uncontradicted proof of the murder, the court held that State was entitled to introduce evidence of the
appellant's intent, and that the evidence of the Oklahoma murders four days after the charged offense
was same transaction contextual evidence. Id. at 532.

 Another case in which the court of criminal appeals held a legally distinct and arguably
remote offense to be part of the same transaction was Santellan v. State, 939 S.W.2d 155, 168 (Tex.
Crim. App. 1997). Santellan was accused of murder in the course of kidnapping. Santellan claimed
the trial court should not have admitted evidence that he had sexual relations with the victim's corpse
for two days following the murder. The evidence of the sexual abuse of the victim's corpse, the court
said, was crucial to the State's argument that the appellant had the special intent necessary for
attempted kidnapping, and, therefore, capital murder. Although the abuse of the victim's corpse was
a legally separate offense, the court held it was not extraneous to the charged offense, and evidence
of it was same transaction contextual evidence.

Application of Law to Facts

 In the case at bar, the State had the burden of proving Appellant's intent to kill Summer Little
as well as Little's lack of consent to sexual intercourse with Appellant. Appellant's act of arming
himself shortly before the homicide was important proof of his murderous intent. That he was so
armed serves to explain why her body had no recognizably defensive wounds, and therefore bears
on the issue of the victim's lack of consent to sexual intercourse with Appellant. Appellant's return
of the derringer within an hour or two of the crime at approximately the same time that he returned
bloody-handed and told his girlfriend that Summer was dead connects his possession of the weapon
even more closely with the crime. The evidence was probative of important issues in the case. 
Although it was a legally distinct offense, evidence of it was also significantly interwoven with the
charged offense. 

 Appellant's act in apparently carrying a prohibited weapon at the time of the murder was not
an extraneous offense and evidence of it was same transaction contextual evidence. The State was
therefore not required by Rule 404(b) to give Appellant notice that it intended to introduce evidence
of it in its case-in-chief. The trial court did not err, and Appellant's first issue is overruled.


Opinion of Guilt


 In his second issue, Appellant maintains "[t]he trial court erred by allowing the admission of
a police officer's opinion regarding the Appellant's guilt and commission of sexual assault."

 The record reflects the following testimony by Officer Byron Stewart:


 (BY THE PROSECUTION)



 Well, did you, you recall talking to Shelly Lemon?




 Yes.



 Q. Did Shelly Lemon converse with you about any threats?


 MR. LANE: Objection, Judge, what she said to him would be inadmissible
hearsay.


 THE COURT: Just ask at this stage if he conversed with her. Overruled.


Q. (BY MR. POE) Let me rephrase this. After speaking with Shelly Lemon did that
strengthen you[sic] view that Nathaniel does[sic] was guilty or
weaken your view?


 MR. LANE: Objection as to his opinion as to guilt or innocence, Judge. That's
really up to a jury. That's not up to a detective from Arlington. 
I object to the form of the question.


 THE COURT: Overruled.


Q. (BY MR. POE) You can answer that.


 A. Yes, it strengthened my view.



Appellant argues that the evidence was particularly harmful in this case because, in his view, the
evidence of sexual assault was weak. No blood or semen connected Appellant to a sexual assault of
Little. The hair on her body could not be forensically matched with Appellant's. The autopsy
revealed a small abrasion to the anus.

 When Detective Stewart testified that his conversation with Shelly Lemon reinforced his
opinion that Appellant was guilty, the jury had already heard Lemon's testimony. Lemon's testimony
concerned her overhearing Appellant threaten Little on the telephone because she owed him fifty
dollars. She said she heard D.J. (Appellant) tell Little he had killed for less. Nothing in her direct
testimony bore on the issue of sexual assault.

 The State concedes that no witness is competent to give an opinion on guilt or innocence. See
Boyde v. State, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974). An error in the admission of evidence
should be disregarded unless it affected Appellant's substantial rights. See Tex. R. App. P. 44.2(b). 
A substantial right is affected when the error had a substantial and injurious effect or influence in the
determination of the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). An
accused's substantial rights are not affected by the erroneous admission of evidence if the court, after
examining the whole record, has fair assurance that the error did not influence the jury or had but
slight effect. Solomon v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

 Before the challenged testimony, Detective Steward had testified without objection that the
position of the body and his observation of the crime scene led him to conclude that Little had been
sexually assaulted. Immediately before the challenged testimony regarding his conversation with
Shelly Lemon, Detective Stewart again stated his opinion that the appearance of the crime scene led
him to conclude that a sexual assault had taken place.

 Appellant admitted to Selena that he had had sexual intercourse with Little which he said
"started out" to be consensual. All the other evidence in the record indicates Little was justifiably
afraid of Appellant, and therefore highly unlikely to voluntarily submit to sexual intercourse with
him. He had harassed Little for several months before her death with lewd suggestions as well as
murderous threats.

 Little's battered body was found nude with her face and upper body face down in the bathtub
with her legs hanging over the side. She had a small abrasion on the anus. Bloodstains were found
in both the upstairs and downstairs bathrooms. The apartment was in total disarray; her shorts and
bra were in the living room, a bloodstained tee-shirt was on the television, and her panties were in
the upstairs bedroom.

 Considering the challenged testimony in the light of the entire record, we conclude that the
improperly admitted evidence had no substantial or injurious effect on the jury's determination of its
verdict. Appellant's second issue is overruled.


Conclusion


 The judgment is affirmed.

 BILL BASS 

 Justice

Opinion delivered July 31, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and Bass, Retired Justice, Twelfth Court of Appeals, Tyler, sitting by assignment.



(DO NOT PUBLISH)