**AFFIRMED; Opinion Filed July 31, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-16-00972-CR
No. 05-16-00973-CR

**BILLY JOE MCCLAIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause Nos. F15-30578-J & F15-30729-J**

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Evans
Opinion by Justice Evans

Billy Joe McClain appeals his convictions for possession of methamphetamine with intent to deliver and evading arrest. The trial court sentenced appellant to thirty years' imprisonment in both cases. In two issues, appellant claims the trial court abused its discretion by admitting evidence from the State's expert witness that was irrelevant and unfairly prejudicial. We affirm the trial court's judgment.

## BACKGROUND

On June 28, 2015, Officer Castleberry and his partner, Officer Castaneda, were on patrol in Grand Prairie. They came up to a red light and noticed a motorcycle pull up next to them with a male driver and female passenger. The female passenger was wearing a backpack. The officers could not identify the motorcycle's license plate because it was so bent and dirty that it was

completely unreadable. The light turned green before Castleberry could activate his red and blue lights to signal a traffic stop. Once he turned on the lights, the driver of the motorcycle looked back over his shoulder, saw the lights and took off at a high rate of speed. Castleberry gave chase. Officer Munoz joined the pursuit. At one point, Munoz saw the motorcycle lying on a bank just below a bridge and the driver and passenger running away towards an overgrown field where they tried to hide in the grass. Munoz followed them on foot, and called for other officers to assist. After the other officers arrived, both passengers were arrested. Both Castleberry and Munoz identified appellant as the male driver. Castleberry estimated that the entire chase took about six minutes and lasted about four miles.

During the chase, the female passenger threw off the backpack. The backpack was retrieved and contained a marriage certificate with appellant and the passenger's name on it; unopened mail addressed to appellant; male boxer shorts; a toothbrush with the initials B.J.M.; a digital scale with residue on it consistent with methamphetamine and cocaine; an empty pill bottle, 20 baggies, two with residue in it consistent with methamphetamine; a glass pipe used to smoke methamphetamine; a hollowed out Pepsi bottle containing a bag with 81.57 grams of methamphetamine; a quarter ounce of marijuana; and loose pills. The backpack also contained a pawn ticket in the name of the female passenger.

## ANALYSIS

In two issues, appellant claims that the trial court abused its discretion by admitting evidence from a State's witness to the effect that methamphetamine production is "disastrous" and can lead to the "blowing up" of people, houses, and other structures.[1] Appellant argues that

---

[1] Appellant's Point of Error 1 states: "The trial court abused its discretion by admitting evidence from the State's expert witness about structures and people being "blown up" by unknown persons associated with the illegal trade in methamphetamine."

the evidence had little, if any, probative value to the offenses charged and that its probative value was outweighed by its prejudicial impact. We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). A trial court's decision will be upheld when that decision is within the zone of reasonable disagreement. *Id.*

The State presented the testimony of Detective Steve Junker, a narcotics expert, to prove intent to deliver. Detective Junker first testified regarding his experience and training in narcotics. When asked specifically about his familiarity and experience with methamphetamine, the following occurred:

> A. Well, when I started in my career, methamphetamine was clandestinely made. It is made from different chemicals that are all put together, and then it's cooked, and it changes the structure of a molecule into methamphetamine. It's what they call a central nervous system stimulant, or they call it speed.
>
> And in that time in doing labs, things have changed because certain chemicals became illegal, and then they figured out different ways to cook it. So if anybody's had a cold or flu and you've tried to get cold medicine, well now you have to show your ID. It's called The Pseudoephedrine Act because pseudoephedrine and methamphetamine are very similar in the chemical structure of them. So when people manufacture it or they add chemicals to it, it changes pseudoephedrine into methamphetamine. So we had several clandestine labs. I am clan lab certified through DEA. Been to Quantico, Virginia. I go to yearly classes and stay up to date on clan labs.
>
> But the Mexican cartels a few years ago when The Pseudoephedrine Act came into place in the U.S., it didn't take place in Mexico. So the cartels realized that the U.S. is a good market for meth, so they started mass producing methamphetamine. *So the good part for us, we didn't have the labs exploding, but the problem was they started flooding the market with methamphetamine.* So now it's mainly produced in Mexico.
>
> There is one pharmaceutical grade meth that is used for ADD in -- ADD, AD/HD. Very, very rarely seen. I think I've only seen it one time in my career. A lot of the ADD medicines are Ritalin, Adderall, which is an amphetamine based, not methamphetamine. *But almost 99.89 percent of the methamphetamine that we*

---

Appellant's Point of Error 2 states: "The trial court abused its discretion by admitting evidence from the State's expert witness about the "disastrous" effects of manufacturing methamphetamine."

*see working the streets is clan lab made and is coming in right now in from Mexico.*

Q. So when people in America were making their own meth, are these – were these like chemists or scientists? What type of person was making the meth in these labs that you're talking about?

A. Well, they definitely weren't chemists. Chemists did come up with it, but you can get on the Internet and figure out how to make it, and so that's one of the reasons why we had *a lot of people being blown up, houses being blown up, apartments, motel rooms*.

MR. BRATTON: Excuse me. Sorry. This – I understand we maybe need to educate the jury a little on that, but as far as this goes, I think it's not relevant. I think its 403 balancing doesn't have this as being relevant to the issues before the jury right now, so I'm going to object to going off and talking about houses being blown up. That has nothing to do with this case whatsoever.

THE COURT: I'll overrule at this point. Find prejudicial value is outweighed by probative value.

. . . .

Q. (By Ms. Lockhart) Okay.  So just – –

A. Well.

Q. – – typical person could learn how to make meth and potential – –

A. Right.

Q. – – could be *disastrous*?

A. – – all you had to do.

MR. BRATTON: Again, I'm going to continue to object to the "disastrous" nature of this. Has no relevance to the issue before the jury. I object to that.

THE COURT: Overruled. Go ahead.

A. Basically you could get Online, find out the chemicals you needed, go to a family store in the Metroplex, get pseudoephedrine, everything it is to make meth and go home and make it. Again, very easy. Can be done in 30 minutes to less than four hours, you have meth. It was just *very dangerous* to make.

Q. Okay. So now that it's harder to get large amounts of Sudafed, you're saying that the Mexican cartels have taken over making it?

A. That is correct.

Q. Does that mean that people in America aren't making their own meth still?

A. No, you may still have every now and then somebody wants to make their own, but we're finding very, very few and far between anywhere in the U.S. where we would have thousands of labs to maybe now less than a hundred. That's throughout the whole U.S. because the cartels have literally flooded the U.S. with high quality meth, and it's just – why take the risk to make it and spend the cost when the price has dropped significantly.

Q. I see. But I think it wasn't too long ago that we heard about these shake and bake methods in a Coke bottle. People were even doing it at Walmart. How does that fit in?

A. Well, when they – –

Q. First explain what I'm talking about, and tell me how it fits in.

A. One powder of shake and bake is taking pseudoephedrine, lithium, sodium hydroxide, ether, lithium out of a battery, taking all these chemicals, putting it into a bottle like a Pepsi bottle or a -- one of the big liter bottles or even Gatorade. So you take all these chemicals, put it in it, screw down the top and shake it and then pop the top and let it get air, and it starts producing methamphetamine. They call it a one powder of shake and bake. *And they're highly deadly.*

Q. Even as they make good quality meth, they were *dangerous, people were getting blown up a*nd –

MR. BRATTON: Once again, Your Honor, I'm going to have to keep objecting. That has no relevance to what we have here about people getting blown up. I object to that.

THE COURT: Overrule. Go ahead.

. . . .

Q. (By Ms. Lockhart) Okay. So are you telling the jury just what the reality of this meth world is?

A. Yes, ma'am.

Q. So now we're to the reality of we have Mexican cartels bringing methamphetamine into our country.

A. Yes, ma'am.

(emphasis added). Detective Junker went on to explain how methamphetamine is ingested by a user, the effect it had on a user, how it is bought and sold, and the prices that are charged. He then talked specifically about what the evidence in this case indicated and stated his opinion that based upon everything he saw, the person in possession was a dealer that also used the drug.

The State argues that the objectionable comments were relevant because they explained why Detective Junker was qualified to render an expert opinion in this case. We agree. In context, the State elicited this testimony to show that Detective Junker was qualified to opine on issues related to the possession and delivery of methamphetamine.

The evaluation of an expert's qualifications requires a two-step inquiry: first, whether the witness has a sufficient background in a particular field; and second, whether that background goes to the matter on which the witness is to give an opinion. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010); *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). The focus is on the fit between the subject matter at issue and the expert's familiarity with it. *Davis*, 329 S.W.3d at 813; *Vela*, 209 S.W.3d at 133. Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case. *Davis*, 329 S.W.3d at 813. The trial court did not abuse its discretion by overruling appellant's relevancy objection. *See Miles v. State*, 468 S.W.3d 719, 729 (Tex. App.—Houston [14th Dist.] 2015), *aff'd*, 506 S.W.3d 485 (Tex. Crim. App. 2016) (testimony from psychologist at Child Advocacy Center that thirty victims had come through the center for domestic human trafficking was relevant to the witness's ability to render opinions about child sex-offense victims).

Next, we consider whether the trial court abused its discretion in overruling appellant's Rule 403 objection under appellant's first issue.[2]  Under Rule of Evidence 403, the trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice.  TEX. R. EVID. 403.  When we weigh considerations of unfair prejudice against the probative value of the evidence in this case, such considerations do not prevail.[3]  We are to allow trial courts considerable leeway in permitting juries to hear, as in this case, "background" contextual evidence that is relevant to a crime charged against the accused.  *See Roy v. State*, 997 S.W.2d 863, 866 (Tex. App.—Ft. Worth 1999, pet. ref'd.) (citing *Mayes v. State*, 816 S.W.2d 79, 86-87 (Tex. Crim. App. 1991)) (trial court did not abuse its discretion by admitting background testimony about the Crips gang as more probative than prejudicial).  In this case, appellant was charged with possession of methamphetamine with the intent to deliver.  Detective Junker's reference to people and houses being blown up during the process of making methamphetamine was an integral part of his broad and lengthy narration on the background of methamphetamine in general.

Even if the trial court did err in overruling appellant's objections, we conclude appellant was not harmed by the error.  It is well settled that inadmissible evidence can be rendered harmless when substantially the same evidence is admitted elsewhere without objection.  *Mayes*, 816 S.W.2d at 88.  When Detective Junker first talked about the Mexican cartels producing the

---

[2] As the State noted in its brief, with regard to issue two, the prosecutor's reference to the "disastrous" effects of ordinary people making meth, appellant's counsel only objected based on relevance; he made no reference to Rule 403 or complain that the evidence was unfairly prejudicial.  Thus, nothing is presented for review as it pertains to Rule 403 in appellant's second issue.  *See Beasley v. State*, 838 S.W.2d 695, 702 (Tex. App.—Dallas 1992, pet. ref'd.).

[3] When undertaking a Rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.  *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

methamphetamine that is sold now in the U.S., he made reference to labs exploding without objection from appellant's counsel. Further, Detective Junker's testimony is replete with unobjected to references regarding how dangerous it was to make methamphetamine. In addition, Detective Junker told the jury that the methamphetamine in this case came from Mexico; that people in the U.S. are no longer making their own methamphetamine because it is not cost effective to compete with the lower-priced, high quality methamphetamine imported from Mexico; and that all the methamphetamine in the last several years has come from Mexico.[4] We overrule appellant's first and second issues.

## CONCLUSION

For these reasons, we decide appellant's issues against him and affirm the judgments of the trial court.

/David W. Evans/
DAVID EVANS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
160972F.U05

---

[4] Specifically, the following exchange occurred during Detective's Junker cross-examination:

Q. Okay. The -- the methamphetamine you looked at it on sight, you've seen it so many times, you can tell without analysis, I would assume, just from your experience.
A. Yes, sir.
Q. Where does that come from?
A. Where does my experience come from?
Q. No. Where does that methamphetamine come from?
A. I can tell you that the meth that we're getting is coming from Mexico.
Q. I'm asking you where did that come from?
A. Which cartel? I don't know.
Q. You say it's -- so it comes from Mexico.
A. Correct.
Q. You don't think it's made here.
A. No.
Q. You can't be wrong about that.
A. I'm telling you in the last several years, we have not done any meth labs here. Everything's coming in from Mexico.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BILLY JOE MCCLAIN, Appellant

No. 05-16-00972-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas
Trial Court Cause No. F15-30578-J.
Opinion delivered by Justice Evans, Justices Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 31st day of July, 2017.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BILLY JOE MCCLAIN, Appellant

No. 05-16-00973-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas
Trial Court Cause No. F15-30729-J.
Opinion delivered by Justice Evans, Justices Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 31st day of July, 2017.