NO. 07-07-0365-CR and 07-07-0366-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

NOVEMBER 30, 2007
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â ______________________________

TRAMAYNE DEODRICK JOHNSON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_________________________________

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 54,419-E, 54,420-E; HONORABLE ABE LOPEZ, JUDGE
_______________________________


Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.
ON MOTION TO DISMISS
Â Â Â Â Â Â Â Â Â Â Before the Court are appellantâs motions to dismiss these appeals pursuant to Rule
42.2 of the Texas Rules of Appellate Procedure. Rule 42.2 states that at any time before
the appellate courtâs decision, the court may dismiss an appeal upon the appellantâs
motion. Tex. R. App. P. 42.2(a). The appellant and his attorney must sign the written
motion to dismiss. Id. 
Â Â Â Â Â Â Â Â Â Â All of the requirements of Rule 42.2(a) have been satisfied. The Court has
considered these causes on appellantâs motions and concludes the motions should be
granted and the appeals should be dismissed.
Â Â Â Â Â Â Â Â Â Â Accordingly, the appeals are dismissed. No motions for rehearing will be
entertained and our mandates will issue forthwith. 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Mackey K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice









Do not publish. 








dium Grid 2"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 









NO. 07-10-00188-CR

Â 

IN THE COURT OF APPEALS

Â 

FOR THE
SEVENTH DISTRICT OF TEXAS

Â 

AT
AMARILLO

Â 

PANEL C

Â 



MARCH
29, 2011

Â 



Â 

JOEL A. SAUCEDO, APPELLANT

Â 

v.

Â 

THE STATE OF TEXAS, APPELLEE 



Â 



Â 

 FROM THE 137TH DISTRICT COURT OF
LUBBOCK COUNTY;

Â 

NO. 2002-438,654; HONORABLE CECIL G. PURYEAR, JUDGE



Â 



Â 

Before QUINN,
C.J., and HANCOCK and PIRTLE, JJ.

Â 

Â 

MEMORANDUM OPINION

Â 

Â Â Â Â Â Â Â Â Â Â Â  Appellant,
Joel Saucedo, appeals his conviction for murder[1]
and the resulting life sentence.Â  We will
affirm.

Factual and Procedural History

Â Â Â Â Â Â Â Â Â Â Â  Back
in November of 2001, coworkers discovered the badly beaten body of Jose Neri, manager of the Corta Vista
Apartments in Lubbock.Â  Neri had been beaten about the head then bound and gagged
by a number of his own neckties.Â  The
police secured the scene and began to conduct interviews with the residents and
employees of the apartment complex.Â  An
assistant manager noted that it was unusual that appellant, a maintenance
worker at the same complex, was not out of his apartment especially considering
all the activity going on at the time.Â 
Police learned from Yolanda Tello and Alice
Hernandez that the two had given appellant a ride to the bus station the
previous morning where he planned to catch a bus to El Paso.

Â Â Â Â Â Â Â Â Â Â Â  Pursuant
to a warrant, police conducted a search of appellantÂs apartment and found it
to be largely empty save a few items, most notably a pair of socks and a blue
plaid shirt.Â  On the socks were spots of
blood though ultimately not enough to allow for a reliable sample for DNA
testing.Â  Blood was also present in
several spots on the blue shirt found in appellantÂs apartment, and DNA testing
of those samples revealed that the blood spots matched NeriÂs
DNA.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  Years
later, in March 2009, appellant was arrested in Tepyic,
Mexico and extradited back to the United States to stand trial on charges of
murder.Â  A Lubbock County jury found
appellant guilty of murder and assessed a life sentence.

Â Â Â Â Â Â Â Â Â Â Â  Appellant
timely appealed his conviction and has brought to this
Court two issues: (1) the sufficiency of the evidence to support his
conviction, and (2) the propriety of the trial courtÂs admission of evidence
relating to the extradition process and showing that appellant was born in
Mexico.

Sufficiency of the Evidence

Â Â Â Â Â Â Â Â Â Â Â  Appellant
challenges the sufficiency of the evidence to support his conviction.

Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  In
assessing the sufficiency of the evidence, we review all the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt.Â  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Brooks v. State,
323 S.W.3d 893, 912 (Tex.Crim.App. 2010).Â  We measure the sufficiency of the evidence
against a hypothetically correct jury charge.Â 
See Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App.
1997). Â[O]nly that evidence which is sufficient in
character, weight, and amount to justify a factfinder
in concluding that every element of the offense has been proven beyond a
reasonable doubt is adequate to support a conviction.ÂÂ  Brooks, 323 S.W.3d at 917 (Cochran,
J., concurring).Â  We remain mindful that
Â[t]here is no higher burden of proof in any trial, criminal or civil, and
there is no higher standard of appellate review than the standard mandated by Jackson.ÂÂ  Id. (Cochran, J., concurring).Â  When reviewing all of the evidence under the Jackson
standard of review, the ultimate question is whether the juryÂs finding of
guilt was a rational finding.Â  See
id. at 906, 907 n.26 (discussing Judge
CochranÂs dissenting opinion in Watson v. State, 204 S.W.3d 404, 448Â50
(Tex.Crim.App. 2006), as outlining the proper
application of a single evidentiary standard of review).

Analysis

Â Â Â Â Â Â Â Â Â Â Â  The
jury heard that, on the Saturday night before he left town, appellant was
wearing the blue plaid shirt that was found in his apartment and later found to
have the victimÂs blood on it.Â  When
Yolanda and Alice returned from their night out, they noticed that appellant
was sitting in the dark in his apartment with his door open.Â  They both recalled him being very nervous,
ÂshakyÂ and Âpanicky.ÂÂ  Yolanda, with
whom appellant had a romantic relationship, remembered that when she and Alice
saw him on Sunday morning just prior to his departure, he was wearing a
long-sleeved beige shirt that she had given him for his birthday.Â  Alice testified that appellant had opted to
throw his packed bags out the back window of his apartment and then put them in
the car so that no one would see him leaving.Â 
Appellant explained to Yolanda that she would understand why he left
after he was gone.

Â Â Â Â Â Â Â Â Â Â Â  The
jury also learned that appellant asked Alice and Yolanda to take him to Mexico
and offered them $200.00 to $300.00 if they agreed to do so.Â  They declined.Â  Appellant had the girls drive slowly over to
the residence of a co-worker, Moses, to seek a ride from him and his
girlfriend. [2]Â  They, too, declined.Â  So, Yolanda and Alice drove appellant to the
bus station where he used cash to buy a ticket and caught a bus to El Paso
early on Sunday morning where he intended to and did make entry to Mexico.

Â Â Â Â Â Â Â Â Â Â Â  The
record also reveals from a number of sources that the relationship between
appellant and Neri was ÂrockyÂ or ÂtenseÂ and that
the two would bicker.Â  Yolanda,
testified that appellant did not like Neri, resented NeriÂs negative reports on appellantÂs work performance,
called Neri derogatory names, and made a number of
negative comments about NeriÂs tie collection.Â  Another coworker suggested that appellant
envied NeriÂs higher-paying office job.Â  The jury also learned of a missing key to and
cash from a lockbox which should have held a large sum of money, likely over
$5,000.00.Â  Appellant, who apparently had
an uncharacteristically large amount of cash the morning he left town, had
access to the key and the lockbox.Â  NeriÂs apartment was connected by a hallway to the
apartment complex office where the lockbox was kept.

Â Â Â Â Â Â Â Â Â Â Â  What
property was left in appellantÂs residence appeared to be in disarray and
appeared to have been the result of a hasty departure from the apartment.Â  Included
in the items left in the apartment were a shirt and a pair of socks found in
the bedroom.Â  The jury learned that the
shirt found in appellantÂs apartment, the blue plaid one that Yolanda
positively identified as the shirt appellant had been wearing the night before
he left town, bore spots of blood that DNA testing confirmed as matching NeriÂs blood.Â  The
DPS analyst testified that, although the socks found in appellantÂs bedroom
also tested positive for the presence of blood, the lab could not extract a
large enough quantity from one of the socks to yield a reliable sample for
comparison.[3]

Â Â Â Â Â Â Â Â Â Â Â  Appellant
cites the lack of fingerprint evidence placing him in NeriÂs
residence, particularly in the bedroom and bathroom of the residence.Â  LPD crime scene officer Bruce Short testified
that, though he examined the wine glasses in NeriÂs
bedroom, they yielded no usable prints because it appeared a beverage had
spilled over the sides and left a residue.Â 
Further, a bloody fingerprint on the bedroom doorknob was not
sufficiently clear to permit Short to conclusively match the print to
anyone.Â  Simply put, he could not
determine whether it was or was not appellantÂs print.Â  The only usable fingerprint taken from the
remaining contents of the lockbox was identified as belonging to Neri.Â  So, although
the fingerprint evidence did fail to place appellant at the scene of the
murder, it, likewise, failed to place another individual at the scene of the
murder.

Â Â Â Â Â Â Â Â Â Â Â  Appellant
also cites the testimony from Mary Jo Salazar regarding a confrontation that
she witnessed between Neri and another unidentified
man at the complex shortly before the murder.Â 
She recounted the argument, one regarding rent, in which the other man
was angry and yelling at Neri.Â  She testified that she knew Neri as a nice man, that she knew
appellant as well, but that she did not recognize the other man involved in the
argument that day.Â  She testified that
the man bore a teardrop tattoo under one of his eyes and was wearing a blue
shirt.Â  However, she may not have told
officers about the blue shirt in her original statement to them.Â  Salazar admitted that, after eight years, she
could not recall a great deal of detail regarding the incident she had
witnessed and what she had told police in her statement.Â  That Neri may have
been involved in an argument with another man prior to his murder does not
render insufficient the other evidence showing that it was appellant who committed
the murder.

Â Â Â Â Â Â Â Â Â Â Â  Although
there is also some evidence, from Yolanda, that, a short time before the
murder, appellant had mentioned going to Mexico to resolve some family issues,
there is sufficient evidence from which the jury could rationally conclude that
appellant was guilty of murder.Â  His
strange, suspicious behavior early Sunday morning, his hurried flight to
Mexico, his strained if not hostile relationship with the victim,
and the DNA evidence constitute sufficient evidence to support the juryÂs verdict.Â  Based on all the evidence, the juryÂs finding
of guilt was a rational one.Â  See Brooks,
323 S.W.3d at 907. 

Admission of Evidence

Â Â Â Â Â Â Â Â Â Â Â  At
trial, appellant objected to the admission of evidence of Âthe steps they took
to bring him back.ÂÂ  He characterized the
evidence as irrelevant, prejudicial, and immaterial.Â  On appeal, appellant maintains that evidence
concerning the efforts that were made to get appellant back to the United
States from Mexico was irrelevant, as was evidence that appellant was a Mexican
national.

Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  We
review a trial courtÂs decision to admit or exclude evidence for abuse of
discretion.Â  Shuffield
v. State, 189 S.W.3d 782, 793 (Tex.Crim.App.
2006).Â  A trial court does not
abuse its discretion if its decision is within the zone of reasonable
disagreement.Â  See
Walters v. State, 247 S.W.3d 204, 217 (Tex.Crim.App.
2007); Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App.
1991) (op. on rehÂg).Â  We will sustain the trial courtÂs decision if
that decision is correct on any theory of law applicable to the case.Â  Romero v. State, 800
S.W.2d 539, 543 (Tex.Crim.App. 1990).

Evidence Relating To Extradition
Process

Â Â Â Â Â Â Â Â Â Â Â  Appellant
complains of the admission of testimony from LPD detective Ray Martinez
concerning the process of extraditing appellant from Mexico.Â  Martinez was intimately involved in the
process and explained the steps and negotiations between the United States and
Mexico in the extradition.Â  Included in
the multi-step process is the requirement that the United States establish that
the defendant is a Mexican national.

Â Â Â Â Â Â Â Â Â Â Â  Prior
to MartinezÂs testimony, LPDÂs Chris Breunig
testified to the ÂconsiderableÂ efforts made to identify and locate
appellant.Â  Without objection, the
following portion of BreunigÂs testimony came into evidence
the day before the complained-of testimony:

Q. At some point you stated that you had made -- been made aware that
the Defendant had taken a bus to El Paso.Â 
Were there multiple things done by your agency and you personally to try
to locate him and bring him back to Lubbock?

A. Considerable amount of effort by our agency was put into attempting
to locate.

Q. From the get-go or as the process went along or what all types of
things are you talking about?

A. Just to kind of give you a summary view of it, beginning that day
the -- once we learned there was two various bus routes that possibly were
taken, teletypes were sent out to the agencies in El Paso and San Diego,
California, with the attempt to locate.Â 
Of course, we didn't have him informed at that time, but just the
attempt to locate Joel along with some various case
information.Â  Additional follow-up
investigation, myself and another investigator,
Lubbock Police Department, flew to San Diego, California, interviewed
individual[s], met with law enforcement agencies of border patrol and the
Mexican law enforcement agencies, disseminating information, attempting to
locate Joel in Mexico.Â  Additionally,
contact was made with our local border patrol attempting to verify who Joel was
exactly early on in the investigation to try to positively identify him.

Q. And Detective [Ray] Martinez was more of an integral part as far as
extradition and locating him in Mexico; is that your understanding?

A. ThatÂs correct.

Q. So it has been an ongoing deal for about eight or nine years, trying
to get this Defendant back to Lubbock to stand trial today?

A. They did an exceptional amount of work after I left
the unit, yes, sir.

Â Â Â Â Â Â Â Â Â Â Â  Martinez,
to whom Breunig referred in his testimony, testified
the following day.Â  Martinez elaborated
on the efforts made, explaining his interaction with Mexican law enforcement
agencies and the steps one must take in order to extradite any defendant from
Mexico.Â  It was in response to MartinezÂs
testimony that appellant first objected:

I am going to object because that is irrelevant to the issues that are
before the jury right now, the steps they took to bring him back.Â  The fact is he is here right now.Â  The indictment only alleges he is accused of
committing this murder.Â  There is nothing
that has to do with processes that were involved in bringing him back. This is
all prejudicial, and I think that it is irrelevant, it is immaterial to the
issues before the jury, and I am going to object to that.

The trial court overruled appellantÂs
objection but permitted him a running objection to this testimony.

Â Â Â Â Â Â Â Â Â Â Â  The
Texas Court of Criminal Appeals has recently reiterated that Âerroneously
admitting evidence Âwill not result in reversal when other such evidence was
received without objection, either before or after the complained-of
ruling.ÂÂÂ  Coble v. State, 330
S.W.3d 253, 2010 Tex. Crim. App. LEXIS 1297, at *67 (Tex.Crim.App.
2010) (quoting Leday v. State, 983
S.W.2d 713, 718 (Tex.Crim.App. 1998)); see also
Estrada v. State, 313 S.W.3d 274, 302 n.29 (Tex.Crim.App.
2010) (noting that any preserved error with respect to admission of
complained-of evidence was harmless in light of Âvery similar evidenceÂ
admitted without objection); McNac v. State,
215 S.W.3d 420, 424Â25 (Tex.Crim.App. 2007) (in harm
analysis, concluding that the Âunchallenged evidence [was] essentially
cumulativeÂ of the challenged evidence); Marshall v. State, 210 S.W.3d
618, 631 (Tex.Crim.App. 2006) (deciding that any
error in admission of complained-of evidence was harmless because Âappellant
brought out essentially the same evidenceÂ).Â 
In other words, error in the admission of evidence may be rendered
harmless when Âsubstantially the same evidenceÂ is admitted elsewhere without
objection.Â  Mayes v.
State, 816 S.W.2d 79, 88 (Tex.Crim.App. 1991).

Â Â Â Â Â Â Â Â Â Â Â  MartinezÂs
testimony was directed at illustrating the effort, time, and resources
necessary to secure appellantÂs extradition from Mexico.Â  Similar evidence was admitted without objection
when Breunig testified to a summary of Âthe
exceptional amount of workÂ undertaken to complete the extradition
process.Â  Though his testimony was more
general in nature than was MartinezÂs testimony, Breunig
testified to similar material.

Â Â Â Â Â Â Â Â Â Â Â  Even
assuming, without deciding, that the trial court abused its discretion by
admitting MartinezÂs testimony on the extradition process, we conclude that the
error, if any, was harmless because Âvery similarÂ evidence was admitted
without objection by way of BreunigÂs testimony
concerning the time and effort put into the extradition process and the steps
law enforcement officials took in that process.Â 
See Estrada, 313 S.W.3d at 302 n.29.

AppellantÂs Status as a Mexican
National

Â Â Â Â Â Â Â Â Â Â Â  After
his objection to the steps in the extradition process and after he was granted
a running objection to that evidence, appellant lodged a separate objection at
trial (and appears to make a separate contention on appeal) regarding the
admission of appellantÂs birth certificate showing that appellant was a Mexican
national, a fact that U.S. law enforcement agencies must prove in order to
extradite a defendant from Mexico.Â  The
exchange surrounding this issue is as follows:

Q. Detective Martinez, letÂs go through this process.Â  When I have a murder that has taken place in
Lubbock and we believe a defendant has fled to Mexico, if you would, how does
that process start?Â  Where do we begin in
order to try to find the defendant and all those things?

A. One of the first things we need to do, if we believe he is a Mexican
National, we need to confirm it.Â  So one
of the first things that we do is track down information, work with the
information we have and track it down and confirm things in Mexico and, like in
this case, confirm that there is a birth certificate from Mexico that confirms
that he is actually in -- a Mexican [n]ational.

Q. Let me stop you right there for a second.

STATE: May I approach, Your Honor?

THE COURT: You may.

Q. Detective, let me show you what I have marked for identification as
StateÂs Exhibit 312 and ask if you have seen that document before, sir.

A. Yes, sir.

Q. And what is StateÂs Exhibit 312?

A. This is a certified copy of a birth certificate from Mexico for Jose
-- I am sorry -- yeah, Joel Armando Saucedo Alcantar.

Q. Say that for me again?

A. Joel Armando Saucedo Alcantar.

Q. And this is the first step that you do to try to determine whether
or not the defendant is a Mexican national; is that correct?

A. Yes, sir.

Q. Based on this birth certificate and the information that you saw,
was it your understanding that, indeed, the defendant was a Mexican [n]ational?

A. Yes, thatÂs correct.

Q. And this birth certificate gives the lineage of this particular
defendant; does it not?

A. Yes, sir, it does.

Q. Talks about his parentsÂ name?

A. Yes.

Q. GrandparentsÂ name?

A. Yes, sir.

Q. Both maternal and paternal?

A. Yes, sir.

Q. There were some questions asked a
particular witness if it is common that someone from Mexico may take their
motherÂs maiden name when they come over to the United States.Â  Is that your understanding?

A. Well, I know that on a lot of the names that they do have the
motherÂs maiden name on there.

Q. In looking at StateÂs Exhibit 312, do you see the name Bravo
anywhere on that document?

A. No, sir.

Q. Paternal, maternal, grandparents, anywhere?

A. No, sir.

STATE: Your Honor, upon tendering to opposing counsel, State would move
to admit StateÂs Exhibit 312.

DEFENSE: I am going to object on the grounds that I previously stated
before at the bench.

THE COURT: Court will overrule the objection and allow
the admission.

Â Â Â Â Â Â Â Â Â Â Â  To
preserve error in the admission of evidence, the defendant must object in a
timely manner each time the objectionable evidence is introduced or obtain a
running objection.Â  Lane v. State,
151 S.W.3d 188, 193 (Tex.Crim.App. 2004) (citing Valle
v. State, 109 S.W.3d 500, 509 (Tex.Crim.App.
2003)).

Â Â Â Â Â Â Â Â Â Â Â  Although
a required part of the extradition process to which appellant had already
objected and to which he had a running objection, appellant separately objected
to the admission of appellantÂs birth certificate.Â  He argues on appeal that the birth
certificate was inadmissible.Â  He appears
to contend that the birth certificate showed that appellant was a Mexican
national and that evidence of such status was unfairly prejudicial.

Â Â Â Â Â Â Â Â Â Â Â  From
the above-recited excerpt, however, we observe that Martinez had already
testified that, based on the information obtained, the authorities had
determined that appellant was a Mexican national.Â  No separate objection was made at that
point.Â  In fact, Martinez testified that
his conclusion was based, in part, on the birth certificate.Â  No separate objection was made at that point
either.Â  Then there was some discussion
regarding the names appearing on the birth certificate.Â  It was only later, when the birth certificate
was offered, that appellant objected to its admission.Â  At that point, law enforcement officialsÂ
determination that appellant was a Mexican national was already admitted into
evidence, without separate objection.Â 
So, to the extent that appellant may be understood to contend that
evidence of the place of appellantÂs birth was irrelevant and unfairly
prejudicial, standing alone and apart from the evidence pertaining to the
extradition process, his objection at trial was untimely and failed to preserve
any error for our review.Â  See Tex. R. App. P. 33.1(a).

Â Â Â Â Â Â Â Â Â Â Â  Having
concluded that the appellant has not presented this Court with reversible error
in the admission of evidence concerning the extradition process undertaken by
law enforcement officials and that any other error associated with the
admission of appellantÂs birth certificateÂ  was
not preserved for our review, we overrule appellantÂs second point of error.

Â 

Â 

Conclusion

Â Â Â Â Â Â Â Â Â Â Â  Having
overruled appellantÂs points of error, we affirm the trial courtÂs judgment of
conviction.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Mackey
K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Do not publish.Â  

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â  








Â 

Â 











[1]
See
Tex. Penal Code Ann. Â§ 19.02(b)(1) (West 2003).

Â 





[2]
We note that, contrary to YolandaÂs testimony
that appellant was wearing a beige shirt, MosesÂs girlfriend testified that, when appellant arrived
at their residence, he was not wearing a shirt.Â 
The jury was authorized to resolve this apparent inconsistency, and we
note that the record is clear that he
was no longer wearing the blue plaid shirt that he was wearing earlier on
Saturday night.





[3]
According to the analyst, the DPS lab tries to
prioritize its testing by testing those items believed to have the greatest
possibility of yielding a testable quantity of DNA.Â  For this reason, it appears, the sock with
the greatest presence of blood was tested first, but it still did not have
enough blood present to yield a reliable sample for comparison.