NO. 07-10-00188-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

MARCH 29, 2011

JOEL A. SAUCEDO, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2002-438,654; HONORABLE CECIL G. PURYEAR, JUDGE

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Joel Saucedo, appeals his conviction for murder[1] and the resulting life sentence. We will affirm.

Factual and Procedural History

Back in November of 2001, coworkers discovered the badly beaten body of Jose Neri, manager of the Corta Vista Apartments in Lubbock. Neri had been beaten about the head then bound and gagged by a number of his own neckties. The police secured

---

[1] See TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003).

the scene and began to conduct interviews with the residents and employees of the apartment complex. An assistant manager noted that it was unusual that appellant, a maintenance worker at the same complex, was not out of his apartment especially considering all the activity going on at the time. Police learned from Yolanda Tello and Alice Hernandez that the two had given appellant a ride to the bus station the previous morning where he planned to catch a bus to El Paso.

Pursuant to a warrant, police conducted a search of appellant's apartment and found it to be largely empty save a few items, most notably a pair of socks and a blue plaid shirt. On the socks were spots of blood though ultimately not enough to allow for a reliable sample for DNA testing. Blood was also present in several spots on the blue shirt found in appellant's apartment, and DNA testing of those samples revealed that the blood spots matched Neri's DNA.

Years later, in March 2009, appellant was arrested in Tepyic, Mexico and extradited back to the United States to stand trial on charges of murder. A Lubbock County jury found appellant guilty of murder and assessed a life sentence.

Appellant timely appealed his conviction and has brought to this Court two issues: (1) the sufficiency of the evidence to support his conviction, and (2) the propriety of the trial court's admission of evidence relating to the extradition process and showing that appellant was born in Mexico.

## Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence to support his conviction.

<u>Standard of Review</u>

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); <u>Brooks v. State</u>, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010). We measure the sufficiency of the evidence against a hypothetically correct jury charge. <u>See</u> <u>Malik v. State</u>, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). "[O]nly that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction." <u>Brooks</u>, 323 S.W.3d at 917 (Cochran, J., concurring). We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by <u>Jackson</u>." <u>Id.</u> (Cochran, J., concurring). When reviewing all of the evidence under the <u>Jackson</u> standard of review, the ultimate question is whether the jury's finding of guilt was a rational finding. <u>See</u> <u>id.</u> at 906, 907 n.26 (discussing Judge Cochran's dissenting opinion in <u>Watson v. State</u>, 204 S.W.3d 404, 448–50 (Tex.Crim.App. 2006), as outlining the proper application of a single evidentiary standard of review).

<u>Analysis</u>

The jury heard that, on the Saturday night before he left town, appellant was wearing the blue plaid shirt that was found in his apartment and later found to have the victim's blood on it. When Yolanda and Alice returned from their night out, they noticed

3

that appellant was sitting in the dark in his apartment with his door open. They both recalled him being very nervous, "shaky" and "panicky." Yolanda, with whom appellant had a romantic relationship, remembered that when she and Alice saw him on Sunday morning just prior to his departure, he was wearing a long-sleeved beige shirt that she had given him for his birthday. Alice testified that appellant had opted to throw his packed bags out the back window of his apartment and then put them in the car so that no one would see him leaving. Appellant explained to Yolanda that she would understand why he left after he was gone.

The jury also learned that appellant asked Alice and Yolanda to take him to Mexico and offered them $200.00 to $300.00 if they agreed to do so. They declined. Appellant had the girls drive slowly over to the residence of a co-worker, Moses, to seek a ride from him and his girlfriend.[2] They, too, declined. So, Yolanda and Alice drove appellant to the bus station where he used cash to buy a ticket and caught a bus to El Paso early on Sunday morning where he intended to and did make entry to Mexico.

The record also reveals from a number of sources that the relationship between appellant and Neri was "rocky" or "tense" and that the two would bicker. Yolanda, testified that appellant did not like Neri, resented Neri's negative reports on appellant's work performance, called Neri derogatory names, and made a number of negative comments about Neri's tie collection. Another coworker suggested that appellant

---

[2] We note that, contrary to Yolanda's testimony that appellant was wearing a beige shirt, Moses's girlfriend testified that, when appellant arrived at their residence, he was not wearing a shirt. The jury was authorized to resolve this apparent inconsistency, and we note that the record *is* clear that he was no longer wearing the blue plaid shirt that he was wearing earlier on Saturday night.

4

envied Neri's higher-paying office job. The jury also learned of a missing key to and cash from a lockbox which should have held a large sum of money, likely over $5,000.00. Appellant, who apparently had an uncharacteristically large amount of cash the morning he left town, had access to the key and the lockbox. Neri's apartment was connected by a hallway to the apartment complex office where the lockbox was kept.

What property was left in appellant's residence appeared to be in disarray and appeared to have been the result of a hasty departure from the apartment. Included in the items left in the apartment were a shirt and a pair of socks found in the bedroom. The jury learned that the shirt found in appellant's apartment, the blue plaid one that Yolanda positively identified as the shirt appellant had been wearing the night before he left town, bore spots of blood that DNA testing confirmed as matching Neri's blood. The DPS analyst testified that, although the socks found in appellant's bedroom also tested positive for the presence of blood, the lab could not extract a large enough quantity from one of the socks to yield a reliable sample for comparison.[3]

Appellant cites the lack of fingerprint evidence placing him in Neri's residence, particularly in the bedroom and bathroom of the residence. LPD crime scene officer Bruce Short testified that, though he examined the wine glasses in Neri's bedroom, they yielded no usable prints because it appeared a beverage had spilled over the sides and left a residue. Further, a bloody fingerprint on the bedroom doorknob was not

---

[3] According to the analyst, the DPS lab tries to prioritize its testing by testing those items believed to have the greatest possibility of yielding a testable quantity of DNA. For this reason, it appears, the sock with the greatest presence of blood was tested first, but it still did not have enough blood present to yield a reliable sample for comparison.

sufficiently clear to permit Short to conclusively match the print to anyone. Simply put, he could not determine whether it was or was not appellant's print. The only usable fingerprint taken from the remaining contents of the lockbox was identified as belonging to Neri. So, although the fingerprint evidence did fail to place appellant at the scene of the murder, it, likewise, failed to place another individual at the scene of the murder.

Appellant also cites the testimony from Mary Jo Salazar regarding a confrontation that she witnessed between Neri and another unidentified man at the complex shortly before the murder. She recounted the argument, one regarding rent, in which the other man was angry and yelling at Neri. She testified that she knew Neri as a nice man, that she knew appellant as well, but that she did not recognize the other man involved in the argument that day. She testified that the man bore a teardrop tattoo under one of his eyes and was wearing a blue shirt. However, she may not have told officers about the blue shirt in her original statement to them. Salazar admitted that, after eight years, she could not recall a great deal of detail regarding the incident she had witnessed and what she had told police in her statement. That Neri may have been involved in an argument with another man prior to his murder does not render insufficient the other evidence showing that it was appellant who committed the murder.

Although there is also some evidence, from Yolanda, that, a short time before the murder, appellant had mentioned going to Mexico to resolve some family issues, there is sufficient evidence from which the jury could rationally conclude that appellant was guilty of murder. His strange, suspicious behavior early Sunday morning, his hurried flight to Mexico, his strained if not hostile relationship with the victim, and the DNA

6

evidence constitute sufficient evidence to support the jury's verdict. Based on all the evidence, the jury's finding of guilt was a rational one. See Brooks, 323 S.W.3d at 907.

## Admission of Evidence

At trial, appellant objected to the admission of evidence of "the steps they took to bring him back." He characterized the evidence as irrelevant, prejudicial, and immaterial. On appeal, appellant maintains that evidence concerning the efforts that were made to get appellant back to the United States from Mexico was irrelevant, as was evidence that appellant was a Mexican national.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for abuse of discretion. Shuffield v. State, 189 S.W.3d 782, 793 (Tex.Crim.App. 2006). A trial court does not abuse its discretion if its decision is within the zone of reasonable disagreement. See Walters v. State, 247 S.W.3d 204, 217 (Tex.Crim.App. 2007); Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App. 1991) (op. on reh'g). We will sustain the trial court's decision if that decision is correct on any theory of law applicable to the case. Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990).

### Evidence Relating To Extradition Process

Appellant complains of the admission of testimony from LPD detective Ray Martinez concerning the process of extraditing appellant from Mexico. Martinez was intimately involved in the process and explained the steps and negotiations between the

United States and Mexico in the extradition. Included in the multi-step process is the requirement that the United States establish that the defendant is a Mexican national.

Prior to Martinez's testimony, LPD's Chris Breunig testified to the "considerable" efforts made to identify and locate appellant. Without objection, the following portion of Breunig's testimony came into evidence the day before the complained-of testimony:

> Q. At some point you stated that you had made -- been made aware that the Defendant had taken a bus to El Paso. Were there multiple things done by your agency and you personally to try to locate him and bring him back to Lubbock?
>
> A. Considerable amount of effort by our agency was put into attempting to locate.
>
> Q. From the get-go or as the process went along or what all types of things are you talking about?
>
> A. Just to kind of give you a summary view of it, beginning that day the -- once we learned there was two various bus routes that possibly were taken, teletypes were sent out to the agencies in El Paso and San Diego, California, with the attempt to locate. Of course, we didn't have him informed at that time, but just the attempt to locate Joel along with some various case information. Additional follow-up investigation, myself and another investigator, Lubbock Police Department, flew to San Diego, California, interviewed individual[s], met with law enforcement agencies of border patrol and the Mexican law enforcement agencies, disseminating information, attempting to locate Joel in Mexico. Additionally, contact was made with our local border patrol attempting to verify who Joel was exactly early on in the investigation to try to positively identify him.
>
> Q. And Detective [Ray] Martinez was more of an integral part as far as extradition and locating him in Mexico; is that your understanding?
>
> A. That's correct.
>
> Q. So it has been an ongoing deal for about eight or nine years, trying to get this Defendant back to Lubbock to stand trial today?
>
> A. They did an exceptional amount of work after I left the unit, yes, sir.

8

Martinez, to whom Breunig referred in his testimony, testified the following day. Martinez elaborated on the efforts made, explaining his interaction with Mexican law enforcement agencies and the steps one must take in order to extradite any defendant from Mexico. It was in response to Martinez's testimony that appellant first objected:

> I am going to object because that is irrelevant to the issues that are before the jury right now, the steps they took to bring him back. The fact is he is here right now. The indictment only alleges he is accused of committing this murder. There is nothing that has to do with processes that were involved in bringing him back. This is all prejudicial, and I think that it is irrelevant, it is immaterial to the issues before the jury, and I am going to object to that.

The trial court overruled appellant's objection but permitted him a running objection to this testimony.

The Texas Court of Criminal Appeals has recently reiterated that "erroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" Coble v. State, 330 S.W.3d 253, 2010 Tex. Crim. App. LEXIS 1297, at *67 (Tex.Crim.App. 2010) (quoting Leday v. State, 983 S.W.2d 713, 718 (Tex.Crim.App. 1998)); see also Estrada v. State, 313 S.W.3d 274, 302 n.29 (Tex.Crim.App. 2010) (noting that any preserved error with respect to admission of complained-of evidence was harmless in light of "very similar evidence" admitted without objection); McNac v. State, 215 S.W.3d 420, 424–25 (Tex.Crim.App. 2007) (in harm analysis, concluding that the "unchallenged evidence [was] essentially cumulative" of the challenged evidence); Marshall v. State, 210 S.W.3d 618, 631 (Tex.Crim.App. 2006) (deciding that any error in admission of complained-of evidence was harmless because "appellant brought out essentially the same

9

evidence").  In other words, error in the admission of evidence may be rendered harmless when "substantially the same evidence" is admitted elsewhere without objection.  Mayes v. State, 816 S.W.2d 79, 88 (Tex.Crim.App. 1991).

Martinez's testimony was directed at illustrating the effort, time, and resources necessary to secure appellant's extradition from Mexico.  Similar evidence was admitted without objection when Breunig testified to a summary of "the exceptional amount of work" undertaken to complete the extradition process.  Though his testimony was more general in nature than was Martinez's testimony, Breunig testified to similar material.

Even assuming, without deciding, that the trial court abused its discretion by admitting Martinez's testimony on the extradition process, we conclude that the error, if any, was harmless because "very similar" evidence was admitted without objection by way of Breunig's testimony concerning the time and effort put into the extradition process and the steps law enforcement officials took in that process.  See Estrada, 313 S.W.3d at 302 n.29.

Appellant's Status as a Mexican National

After his objection to the steps in the extradition process and after he was granted a running objection to that evidence, appellant lodged a separate objection at trial (and appears to make a separate contention on appeal) regarding the admission of appellant's birth certificate showing that appellant was a Mexican national, a fact that U.S. law enforcement agencies must prove in order to extradite a defendant from Mexico.  The exchange surrounding this issue is as follows:

Q. Detective Martinez, let's go through this process. When I have a murder that has taken place in Lubbock and we believe a defendant has fled to Mexico, if you would, how does that process start? Where do we begin in order to try to find the defendant and all those things?

A. One of the first things we need to do, if we believe he is a Mexican National, we need to confirm it. So one of the first things that we do is track down information, work with the information we have and track it down and confirm things in Mexico and, like in this case, confirm that there is a birth certificate from Mexico that confirms that he is actually in -- a Mexican [n]ational.

Q. Let me stop you right there for a second.

STATE: May I approach, Your Honor?

THE COURT: You may.

Q. Detective, let me show you what I have marked for identification as State's Exhibit 312 and ask if you have seen that document before, sir.

A. Yes, sir.

Q. And what is State's Exhibit 312?

A. This is a certified copy of a birth certificate from Mexico for Jose -- I am sorry -- yeah, Joel Armando Saucedo Alcantar.

Q. Say that for me again?

A. Joel Armando Saucedo Alcantar.

Q. And this is the first step that you do to try to determine whether or not the defendant is a Mexican national; is that correct?

A. Yes, sir.

Q. Based on this birth certificate and the information that you saw, was it your understanding that, indeed, the defendant was a Mexican [n]ational?

A. Yes, that's correct.

Q. And this birth certificate gives the lineage of this particular defendant; does it not?

A. Yes, sir, it does.

Q. Talks about his parents' name?

A. Yes.

11

Q. Grandparents' name?

A. Yes, sir.

Q. Both maternal and paternal?

A. Yes, sir.

Q. There were some questions asked a particular witness if it is common that someone from Mexico may take their mother's maiden name when they come over to the United States. Is that your understanding?

A. Well, I know that on a lot of the names that they do have the mother's maiden name on there.

Q. In looking at State's Exhibit 312, do you see the name Bravo anywhere on that document?

A. No, sir.

Q. Paternal, maternal, grandparents, anywhere?

A. No, sir.

STATE: Your Honor, upon tendering to opposing counsel, State would move to admit State's Exhibit 312.

DEFENSE: I am going to object on the grounds that I previously stated before at the bench.

THE COURT: Court will overrule the objection and allow the admission.

To preserve error in the admission of evidence, the defendant must object in a timely manner each time the objectionable evidence is introduced or obtain a running objection. Lane v. State, 151 S.W.3d 188, 193 (Tex.Crim.App. 2004) (citing Valle v. State, 109 S.W.3d 500, 509 (Tex.Crim.App. 2003)).

Although a required part of the extradition process to which appellant had already objected and to which he had a running objection, appellant separately objected to the admission of appellant's birth certificate. He argues on appeal that the birth certificate

12

was inadmissible. He appears to contend that the birth certificate showed that appellant was a Mexican national and that evidence of such status was unfairly prejudicial.

From the above-recited excerpt, however, we observe that Martinez had already testified that, based on the information obtained, the authorities had determined that appellant was a Mexican national. No separate objection was made at that point. In fact, Martinez testified that his conclusion was based, in part, on the birth certificate. No separate objection was made at that point either. Then there was some discussion regarding the names appearing on the birth certificate. It was only later, when the birth certificate was offered, that appellant objected to its admission. At that point, law enforcement officials' determination that appellant was a Mexican national was already admitted into evidence, without separate objection. So, to the extent that appellant may be understood to contend that evidence of the place of appellant's birth was irrelevant and unfairly prejudicial, standing alone and apart from the evidence pertaining to the extradition process, his objection at trial was untimely and failed to preserve any error for our review. See TEX. R. APP. P. 33.1(a).

Having concluded that the appellant has not presented this Court with reversible error in the admission of evidence concerning the extradition process undertaken by law enforcement officials and that any other error associated with the admission of appellant's birth certificate was not preserved for our review, we overrule appellant's second point of error.

13

Conclusion

Having overruled appellant's points of error, we affirm the trial court's judgment of conviction.


                                        Mackey K. Hancock
                                              Justice



Do not publish.