

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00478-CR

———————————————————

AARON RIOS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1523569R

Before Sudderth, C.J.; Gabriel, J.; and Lee Ann Dauphinot (Senior Justice, Retired, Sitting by Assignment).
Memorandum Opinion by Justice Dauphinot

# MEMORANDUM OPINION

A jury convicted Appellant Aaron Rios of capital murder. The State waived the death penalty, and the trial court sentenced Appellant to life imprisonment. Appellant brings two points on appeal. First, he argues that the evidence is insufficient to support his conviction for capital murder because there is no evidence to support a finding that he committed murder or that he committed or attempted to commit either of the predicate offenses of robbery or burglary.[1] Next, he contends that the trial court reversibly erred by admitting evidence of extraneous offenses.[2]

Because the trial court committed no reversible error, we affirm the trial court's judgment.

## I.    Brief Facts

Joel Rios—who was unrelated to Appellant—testified that on January 12, 2016, while he was outside smoking a cigarette after dark, his neighbor came up to him and said that he had been shot, so Rios called 911. The trial court admitted State's Exhibit 1, a recording of the call, and the State published it to the jury. Rios testified that he had seen three people come out of his neighbor's house, jump into a gray SUV, and take off.

---

[1]*See* Tex. Penal Code Ann. § 19.03(a)(2).

[2]*See* Tex. R. Evid. 403, 404(b).

Responding to a shooting call, Officer Juan Arreguin was dispatched to Rios's neighbor's home. On arrival, because he considered the scene still active, he grabbed his AR-15 before entering the house. Inside, he saw a female lying face down; a large amount of blood had pooled around her head. Given the amount of blood, Officer Arreguin thought that the woman was already dead. The officer cleared the rest of the house and found no one else present. He did, however, notice a puddle of blood in one of the other rooms. Inside the house, Officer Arreguin also saw a television set lying inside the doorway, shell casings lying next to the television, and a surveillance camera.

David Dormady, a paramedic with MedStar, responded to a multiple-gunshot-wound-victims call. At the scene, Dormady saw a male victim with multiple gunshot wounds in the neighbor's yard, and inside the house itself, Dormady found a woman with massive facial trauma, blood spatter, and a large pool of blood. Dormady testified that her eyes were fixed and dilated, which meant that she had been gone for a while. He called a doctor and gave his report, and the doctor pronounced her dead.

Ricardo Castaneda testified; he was Rios's neighbor who told Rios that he had been shot and who had asked Rios for help. Castaneda and Nancy Mata, the woman who had been killed, lived across the street from Rios.

Castaneda testified that on January 12, 2016, he and Mata were at LA Fitness when Steven Moreno had called to say he was going to bring some money to Castaneda's house for Castaneda to hold, so Castaneda and Mata drove straight home.

3

Castaneda explained that his house was a safe house and that he had a lot of marijuana in the garage and some Xanax bars in his closet. Castaneda had two video surveillance cameras on the outside of his house, one above the front door and one on the right corner of his house. Castaneda and Mata were preparing dinner when he saw Moreno on his surveillance camera. Moreno was walking toward the house, so Castaneda let Moreno inside but neglected to lock the door after doing so. Everything seemed normal to Castaneda until Mata told him that someone else had appeared on the camera, so Castaneda ran to the door. By the time he reached it, the door was already opening.

Castaneda testified that he saw Appellant's face and tried to shut the door, but Appellant "stuck his hand in with a gun and started shooting." Castaneda did not know Appellant by name but had seen him twice before with Moreno. The surveillance video shows that when Appellant forced his way into the house, two other men followed him inside. Castaneda ran down the hallway to get a baseball bat out of the closet, saw Moreno, and asked him for help, but instead of helping Castaneda, Moreno took a step toward Castaneda and "kind of tripped" him. At the same moment, Castaneda said that he was shot in the right back shoulder and fell forward. Castaneda got up on his own and ran into his son's bedroom. Appellant continued to chase him, Castaneda fell after entering the room, and Appellant shot him two more times—once in the chest and once in the face.

Appellant left the room after shooting Castaneda, and Castaneda heard Moreno tell Mata, "[T]hey have this family, and they were going to kill them, too, if she didn't

4

give them the money."  Mata, who did not know where Castaneda kept the money, responded, "God, please help."  Castaneda then heard a gunshot and passed out.

When Castaneda regained consciousness, he went looking for a phone, but he could not find his or Mata's.  He had not given anyone permission to remove the phones from the house.  Unable to find the phones, Castaneda then went looking for Mata and found her on the floor next to the couch.  He then went to Rios's house across the street and asked for help.  Rios called 911.  Castaneda spoke with the 911 operator and told her that Moreno had shot him, but at trial, he explained that the reason he named Moreno was because Moreno's was the only name he knew and because Moreno was involved.

Afterward, Castaneda's house was in disarray; everything had been moved.  One television had been moved; another television worth $800 to $1000 was missing.  Both Castaneda's and Mata's phones were also missing.  Numerous other items were stolen, but for the sake of simplicity, we focus on the phones and the missing television.

Dr. Nizam Peerwani, Tarrant County Medical Examiner, testified that he had performed the autopsy on Mata.  She had suffered a gunshot wound to the nasal fold area of her face.  A large-caliber bullet had traveled to the back of her skull, where he recovered it.  Regarding the wound's severity, Dr. Peerwani said, "The injury pattern was too devastating for her to survive . . . ."  He classified her death as "clearly" a homicide.

Detective Matthew Barron testified that Castaneda's surveillance video showed Appellant approaching the door with a gun in his hand. Appellant entered the house with his face uncovered. Detective Barron determined that the other two men with Appellant were DeQuarius Dennis and Israel Ruiz. The surveillance video showed that Dennis had a handgun too.

Appellant was arrested on January 21, taken to Detective Barron's office, and gave a nearly two-hour statement that was recorded and admitted into evidence. Multiple times throughout the interview, Appellant complained that he had never received his cut from the robbery. He admitted that he, Dennis, and Ruiz had taken Castaneda's and Mata's phones and that they had taken a television—items that Castaneda mentioned as missing—to what contextually was a "fence" in a "real[ly] rough, rough area."

At one point, Appellant said, "I used the nine I had on me today. You got me." Later, Appellant corrected himself, "I didn't have the nine; I had a .380." He admitted shooting Mata in the face. When Detective Barron's partner asked Appellant whether he felt bad about killing Mata, Appellant responded, "It is what it is." Apparently dissatisfied with that answer, Detective Barron's partner raised his voice and told Appellant to "[m]an . . . up." This time Appellant responded, "Because [she was] a witness." Appellant also admitted multiple times that he had shot Castaneda and that he thought that Castaneda was dead. Appellant insisted that Dennis and Ruiz know

6

that he had not "snitch[ed] them out" and insisted that he was the shooter; Appellant did not want anyone else coming in and claiming to be the shooter.

Detective Barron agreed that if someone forces entry into a home or enters a home without the owner's consent and then removes property or commits an assault, that person has committed a burglary of a habitation. He also agreed that if a person threatens someone or causes someone bodily injury with the intent to obtain or maintain control of property, that person has committed a robbery.

## II.  Sufficiency of the Evidence

In his first point, Appellant argues the evidence is insufficient to uphold his conviction for capital murder because there is no evidence that he committed murder or that he committed or attempted to commit either of the predicate offenses of robbery or burglary.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3]

---

[3]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[4]

The trier of fact is the sole judge of the weight and credibility of the evidence.[5] Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.[6] Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict.[7] We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.[8]

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial.[9] Such

---

[4]*Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

[5]*See* Tex. Code Crim. Proc. Ann. art. 38.04; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016).

[6]*See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

[7]*Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

[8]*Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

[9]*See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law.").

a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.[10] The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument.[11]

## B. Elements of Capital Murder

As alleged in this case,

- a person commits capital murder if the person commits murder "as defined under Section 19.02(b)(1)" and intentionally commits that murder in the course of committing or attempting to commit burglary or robbery;[12]

- a person commits murder "as defined under Section 19.02(b)(1)" if the person intentionally or knowingly causes an individual's death;[13]

- a person commits a burglary of a habitation if, without the effective consent of the owner, the person enters a habitation and commits or attempts to commit a felony, theft, or an assault;[14] and

---

[10]*Jenkins*, 493 S.W.3d at 599.

[11]*See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

[12]*See* Tex. Penal Code Ann. § 19.03(a)(2).

[13]*See id.* § 19.02(b)(1).

[14]*See id.* § 30.02(a)(3).

- a person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, the person (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.[15]

## C. Murder

In the case now before this court, Castaneda testified that Appellant had a gun, that Appellant shot him with it, and that after Appellant left him, he heard Mata's voice and another gunshot. Appellant was interviewed by Fort Worth Police detectives and admitted shooting Castaneda several times and killing Mata because she was a witness. Appellant shot Mata in the face, a wound that Dr. Peerwani described as too devastating for Mata to survive. Considering the entire record, and applying the appropriate standard of review, we hold the evidence is sufficient to support the jury's verdict that Appellant intentionally caused Mata's death.

## D. Robbery

In addition to charging the jury on robbery, the trial court instructed the jurors on the law of parties.[16] Thus, the jury did not have to view Appellant's conduct in isolation but could view it in conjunction with Dennis's and Ruiz's conduct as well.

Castaneda testified that he had not given anyone permission to take his or Mata's phones or the television. When Appellant pointed the gun at him, Castaneda said that

---

[15]*See id.* § 29.02(a)(1), (2).

[16]*See id.* §§ 7.01(a), 7.02(a)(2), (b).

10

he felt threatened, and when Appellant shot him, Castaneda stated that he suffered bodily injury and felt pain. During Appellant's interview, he admitted that he, Dennis, and Ruiz took Castaneda's and Mata's phones and that they had disposed of a television. We hold the evidence is sufficient to support the jury's verdict regarding murder in the course of committing the felony of robbery.

### E. Burglary

The evidence shows that Appellant literally shot his way into the house as Castaneda initially tried to push the door shut and later ran to get a bat. Castaneda denied giving Appellant, Dennis, or Ruiz permission to enter. Appellant admitted to the detectives that he had shot and believed that he had killed Castaneda and that he had shot and killed Mata because she was a witness. Appellant also admitted to committing the thefts. The record clearly reflects that Appellant entered Castaneda's habitation without Castaneda's consent and then committed aggravated assault with a deadly weapon, attempted murder, murder, and theft.[17] We hold the evidence is sufficient to support the jury's verdict regarding murder in the course of committing the felony of burglary of a habitation.

### F. Conclusion

Having examined the entire record, and applying the appropriate standard of review, we hold the evidence was sufficient to support the jury's verdict that Appellant

---

[17] *See id.* §§ 15.01(a), 19.02(b)(1), 22.02(a), 31.03(a).

11

committed capital murder as alleged in the indictment.  We overrule Appellant's first point on appeal.

## III.  Extraneous Offenses

In his second point on appeal, Appellant argues that the trial court erred by admitting evidence of extraneous offenses.  The trial court admitted evidence that Appellant had committed a drive-by shooting several days after murdering Mata.  Also admitted into evidence before the jury was testimony that, after the murder, Appellant went into the house where Moreno's uncle lived to collect his share of the money stolen from Castaneda's house.

Appellant argues on appeal, as he argued in the trial court, that these two extraneous offenses were inadmissible under Rule 404(b) and Rule 403 of the Texas Rules of Evidence.  The trial court overruled Appellant's objections and admitted the evidence.

### A.  Rule 404(b)

Rule 404(b) embodies the principle that a defendant is not to be tried for collateral crimes or for being a criminal generally.[18] Consequently, extraneous offenses are not admissible to prove that a defendant acted in conformity with his character by committing the charged offense.[19] An extraneous offense, however, has noncharacter-

---

[18]*Karnes v. State*, 127 S.W.3d 184, 188 (Tex. App.—Fort Worth 2003, pet. ref'd).

[19]*Id.* at 188–89.

12

conformity relevance when it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.[20] That is, extraneous offense evidence that tends to make an elemental or evidentiary fact more or less probable or that tends to rebut some defensive theory is relevant beyond its tendency to prove a person's character or that the person acted in conformity therewith.[21] Thus, evidence of other crimes or extraneous misconduct may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[22] As the proponent of extraneous-offense evidence, the State bears the burden of showing admissibility.[23] The trial court's task is to determine whether extraneous offense evidence is relevant for a purpose other than the defendant's propensity to commit crimes or other bad acts.[24]

**B. Rule 403**

Rule 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair

---

[20]*Id.* at 189.

[21]*Id.*

[22]*Id.*

[23]*Id.*

[24]*Id.*

prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."[25] Rule 403 favors admitting relevant evidence and presumes that relevant evidence will generally be more probative than prejudicial.[26] An appellant must overcome this presumption by showing that the danger of unfair prejudice or the danger of misleading the jury substantially outweighs the evidence's probative value.[27]

When conducting a Rule 403 analysis, trial courts must balance

- the proffered evidence's inherent probative force along with

- the proponent's need for that evidence against

- the evidence's tendency to suggest deciding an issue on an improper basis,

- the evidence's tendency to confuse or distract the jury from the main issues,

- the evidence's tendency to encourage the jury to give it undue weight because it lacks other information needed to evaluate the evidence's probative force, and

- the likelihood that presenting the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.[28]

---

[25]Tex. R. Evid. 403.

[26]*See Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd) (citing *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006)).

[27]*Id.*

[28]*Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018).

### C. Standard of Review

Rulings on admissibility should be left largely to the trial court, relying on its own observations and experience; appellate courts will reverse only if the trial court abuses its discretion and acts outside "the zone of reasonable disagreement."[29] Simply because an appellate judge might decide the question differently than the trial judge does not mean that the appellate court should disturb the trial court's ruling on admissibility.[30] As long as the trial court's decision to admit or exclude evidence falls in the zone within which reasonable minds may differ, appellate courts should refrain from disturbing the trial court's decision on appeal.[31]

### D. Discussion

The trip to Moreno's uncle's house is not truly an extraneous. Appellant was trying to collect his share of the money that was the fruit of Mata's capital murder. Appellant's trip to Moreno's uncle's house was, in effect, background contextual evidence.[32] That is, it filled in the narrative, giving the overall picture interest, color, and

---

[29] *See Karnes*, 127 S.W.3d at 189 (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

[30] *Id.*

[31] *Id.*

[32] *See Clark v. State*, No. 03-18-00727-CR, 2020 WL 217178, at *4 (Tex. App.—Austin Jan. 15, 2020, no pet.) (mem. op., not designated for publication); *Blakeney v. State*, 911 S.W.2d 508, 514 (Tex. App.—Austin 1995, no pet.).

lifelikeness.[33] Rule 404(b) does not proscribe background contextual evidence because the evidence illuminates circumstances that the factfinder might otherwise have difficulty understanding.[34] Typically, background contextual evidence does not have particularly compelling probative value as regards the alleged offense's elements but, instead, provides the jury with perspective so that the jurors are equipped to evaluate, in proper context, other evidence that more directly relates to the elemental facts.[35] In this case, Appellant's trip to Moreno's uncle's house helped show his motive for committing the offense in the first place. Because the evidence had no character component extraneous to the charged offense itself, Rule 404(b) did not prohibit its admission.[36] All evidence is designed to be prejudicial, which this evidence was, but Rule 403 addresses only unfairly prejudicial evidence, which this evidence was not.[37] Applying the appropriate standard of review, we hold the trial court committed no error by admitting evidence of this trip.

The drive-by shooting is more problematic. A description of that shooting was part of Appellant's recorded statement to the police. The State offered it ostensibly to

---

[33]*Clark*, 2020 WL 217178, at *4.

[34]*Id.*

[35]*Id.*

[36]*See id.*; *Blakeney*, 911 S.W.2d at 514–15.

[37]*See Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013).

defeat Appellant's claim that his recorded statement was coerced. The police asked Appellant, "Are there any other offenses that we need to be aware of? Have you taken part in any other shootings? Have you killed anybody else?" In response, Appellant said that he had gone to a house in East Fort Worth and had committed a drive-by shooting. He said that he had shot at the house and at the person standing outside. Appellant explained that he had received a call from somebody that the "people at that house owed money."

Detective Barron testified that shell casings recovered by the police from the drive-by shooting were tested and determined to have been fired from the Taurus 9 mm firearm that Appellant had on him the day he was arrested. The State argued at trial that Appellant's position was that he was not the shooter and that the police had coerced his admission. The State argued at trial and on appeal that the evidence from the drive-by shooting produced shell casings that matched the firearm Appellant was carrying at the time of his arrest and thus defeated Appellant's defensive theory that his confession was false and coerced. The State's argument is, frankly, a stretch.[38]

Even were we to hold that the trial court erred, we would nevertheless be required to perform a harm analysis. There was video of Appellant's forcing his way into Castaneda's house with a gun in his hand. He admitted that he had shot and killed

---

[38] *See id.*; *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991), *superseded on other grounds by* Tex. Code Crim. Proc. Ann. art. 38.37.

17

Mata. There was ample evidence to support his admissions, and there was ample evidence showing that he had shot Castaneda. Assuming the trial court erred in admitting the evidence of the drive-by shooting, Appellant suffered no harm.[39] That is, any error in its admission did not affect Appellant's substantial rights.[40] We thus overrule Appellant's second point.

## IV. We Correct a Clerical Error in the Trial Court's Judgment

In the case now before this court, the trial judge assessed punishment. We note the judgment incorrectly reflects that the jury assessed punishment. The judgment contains a clerical error.

A clerical error is an error that does not result from judicial reasoning or determination.[41] A nunc pro tunc order may correct clerical errors in a judgment, but it may not correct judicial omissions.[42] We correct the clerical error in the judgment nunc pro tunc to reflect the judge, not the jury, assessed Appellant's punishment.

## V. Summary

We overrule all of Appellant's points on appeal. The portion of the judgment showing that the jury assessed Appellant's punishment is deleted, and that portion is

---

[39] *See Mayes*, 816 S.W.2d at 88.

[40] *See* Tex. R. App. P. 44.2(b).

[41] *Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988).

[42] *Dewalt v. State,* 417 S.W.3d 678, 690 (Tex. App.—Austin 2013, pet. ref'd).

18

modified to reflect that the trial court assessed his punishment.  As modified, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
Lee Ann Dauphinot
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  November 19, 2020